[Cite as *In re C.L.*, 2023-Ohio-462.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE C.L., ET AL.                     :

Minor Children                         :               No. 111667

                                       :

[Appeal by Mother, G.D.]               :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 16, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-20902706 and AD 20902707

---

### *Appearances:*

Edward F. Borkowski, Jr., *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, Rachel Matgouranis and Joseph C. Young,
Assistant Prosecuting Attorneys, *for appellee*.

ANITA LASTER MAYS, A.J.:

{¶ 1} Appellant G.D. ("Mother") appeals from the judgment of the Cuyahoga County Common Pleas Court, Juvenile Division, that terminated the parental rights of Mother and the fathers of two children, C.L. (born in 2006) and B.D. (born in 2012), and awarded permanent custody to appellee Cuyahoga County

Division of Children and Family Services ("CCDCFS"). The father of B.D. ("Father B.D.") has appealed the judgment in the companion case of *In Re C.L.*, 8th District Cuyahoga No. 111767. Mother's challenge to the award is the focus of this appeal.

{¶ 2} We affirm the juvenile court's judgment.

## I. Procedural Summary

{¶ 3} On February 28, 2020, the agency moved for predispositional emergency custody and filed a complaint for temporary custody alleging that the children were neglected as defined in R.C. 2151.03(A)(3). The children were previously committed to the legal custody of Mother's cousin in Cuyahoga J.C. Nos. AD17914599 and AD17915500. The relative was no longer willing to provide care for the children, and Mother had failed to adequately resolve the removal concerns. Father of B.D. had not yet established paternity, support, visitation, or communication with B.D. The father of C.L. ("Father C.L.") had failed to support, visit, or communicate with C.L.

{¶ 4} On March 19, 2020, the temporary custody hearing was held. Mother stipulated that the children were dependent under R.C. 2151.04 pursuant to the amended complaint. The social worker opined that foster care was in the best interest of the children. The GAL testified that the children were doing well in foster care, agreed temporary custody was in the best interest of the children, and recommended counseling. The juvenile court found by "clear and convincing evidence" "based on Mother's stipulation and the testimony that a danger to the

children exists and the children are adjudicated dependent," that temporary custody was appropriate, and the parties agreed to proceed to disposition.

{¶ 5} On July 21, 2020, the adjudicatory and dispositional hearing was held, the children were adjudicated dependent based on the amended complaint, and temporary custody was granted to the agency on August 7, 2020. On January 27, 2021, CCDCFS moved to modify temporary custody to permanent. On February 1, 2022, the juvenile court granted a continuance requested by Father B.D. who advised that paternity had been established. On May 25, and May 26, 2021, trial was held, and in a May 31, 2022 entry, the juvenile court awarded permanent custody to the agency. On June 14, 2022, Mother appealed.

## II. Permanent Custody

{¶ 6} CCDCFS moved to modify temporary custody to permanent custody pursuant to Juv.R. 19 and R.C. 2151.413(A). The agency asserted that clear and convincing evidence supported the grant of permanent custody under R.C. 2151.414(B)(1), 2151.414(E), and in the best interest of the children under 2151.414(D)(1)(a)-(e).

{¶ 7} The supporting affidavit avers in part that the children had been adjudicated abused, neglected, or dependent at least three separate times. The children had five placements in the last three years with the last eight months in foster care. The children received trauma counseling, and B.D. received counseling and medication for her special needs. Mother had a chronic substance abuse problem dating back to at least 2012, tested positive for cocaine in February 2020,

and had not completed random screens since March 2020. Mother was incarcerated in Cuyahoga County Jail with pending theft charges at the time the affidavit was executed and had repeatedly been incarcerated during the last four years.

## A. Permanent Custody Dispositional Hearing

{¶ 8} Mother and Father B.D. appeared with counsel at the May 25, 2022 trial. Mother was reportedly in favor of an award of custody to Father B.D. Father B.D.'s request for a second trial continuance was denied.

{¶ 9} B.D.'s school intervention specialist had been working with B.D. for approximately six months. The specialist was involved with implementing B.D.'s Individualized Education Plan ("I.E.P.") to assist B.D. with behavioral management and coping mechanisms.[1] B.D.'s behavior deteriorated around January to February 2022, and she was suspended multiple times. The specialist recounted incidents of B.D. hitting, fighting, running the halls, tearing up classrooms, and throwing chairs, and once bringing marijuana to school.

{¶ 10} The specialist stated B.D. was very smart and she liked B.D. a lot, but B.D. had not been receptive to the behavioral modification efforts. "She is just an angry, angry child, and there's nothing or anything — if she perceives something, that is her reality and it's a fight-or-flight kind of thing." (Tr. 31.) The specialist had secured permission to have B.D. be placed in an intensive behavioral classroom with

---

[1] Via an I.E.P., school districts, in conjunction with county boards of disabilities and other educational agencies, provide for individualized education programs for children with disabilities. *See* Ohio Adm.Code 3301-51-07.

fewer students to work on her social and emotional issues for the next school year. Academically B.D. was doing well.

**{¶ 11}** While the specialist had not observed B.D. with either parent, she was informed by the principal that a male who B.D. introduced as her father attended a "March Dadness" event with B.D. and the interaction was positive. However, B.D.'s behavioral issues did not improve after the March event up to the day of trial.

**{¶ 12}** The specialist did not interact with the parents, but communicated with the foster mother, listed guardian, and the agency. The foster mother also expressed concern regarding B.D.'s behavior.

**{¶ 13}** Foster mother L.F. ("Foster Mother") testified that she had been caring for the children for a little over two years. B.D. arrived with behavioral issues and her negative behaviors had escalated. B.D. was diagnosed with post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, paranoid schizophrenia, and mood disorder. B.D. had begun to hear voices, experienced suicidal ideations, and engaged in self-harming activities. Foster Mother said that things were "spiraling out of control," and she had summoned police for assistance six times in six weeks prior to trial. (Tr. 50.)

**{¶ 14}** Older brother C.L. also suffered from PTSD and ADHD but was doing relatively well. C.L. also tried to assist with managing B.D.'s outbursts. Foster Mother believed Father C.L. lived nearby because C.L. often said he would run into Father C.L. when he visited a local store. Father C.L. had stopped by the house to

speak with C.L. a couple of times but made no other efforts at involvement in C.L.'s life or with the agency.

{¶ 15} Mother's visits with the children were primarily via video calls, though Mother was sometimes unavailable for video calls due to incarceration. Foster Mother suspended Mother's in-person visits after B.D. advised hospital personnel that seeing Mother was a behavioral trigger for her. On occasion, Foster Mother took the children to the beauty shop where Mother sometimes worked to get their hair done.

{¶ 16} Mother contacted Foster Mother weekly to speak with the children or ask how they are doing. Foster Mother updated Mother about B.D.'s behavioral issues and C.L. and Mother were in contact through social media. Foster Mother also communicated with the social worker, the SAFY[2] foster care agency supervisor, and more recently, Father B.D. Foster Mother explained that it had been difficult to schedule visits with B.D. and Father B.D. due to Father B.D.'s rotating three-shift schedule, Foster Mother's work schedule, and B.D.'s school schedule. Foster Mother offered that B.D. should be hospitalized and properly diagnosed instead of merely having her medications switched.

{¶ 17} The social worker testified she began working with the family in September 2021 but had reviewed the case file and history. The family's history with the agency began in 2012 when B.D. was born with a positive test for phencyclidine

___

[2] SAFY is an agency that provides therapeutic foster care, behavioral health, family preservation, older youth services, and adoption services. safy.org/ohio/Cleveland

("PCP"). Protective supervision was granted and later terminated. In 2016, the children were found wandering the streets. Mother was incarcerated at the time and had left the children with an older sibling who was unable to care for them.

{¶ 18} In 2017, the children were again removed from the home due to Mother's failure to address alcohol and substance-abuse issues (primarily PCP and cocaine), outstanding warrants, and domestic violence concerns. Legal custody was awarded to Mother's cousin who advised the agency in 2019 that she could no longer care for the children. Mother was not yet substance-abuse compliant.

{¶ 19} Mother had not been appearing for screening but claimed she had been clean since a positive test in February 2020. Mother advised CCDCFS that she was tired of the process and was no longer going to participate, and she has never completed a case plan. Proper housing had not been secured, and Mother informed the agency that current housing was not appropriate for the children due to undesirable activities in the area. Mother was attempting to secure subsidized housing, sometimes assisted at a hair salon, and said that she sat with 24-hour-health-care clients on weekends. The social worker believed Mother was working, but Mother had not provided pay stubs or proof of employment.

{¶ 20} The permanency plan was reunification. If infeasible, the concurrent plan was permanent custody and adoption. Mother, Father B.D., C.L., and B.D. were listed as plan participants. Father C.L. was an absent parent who was not engaged with the agency or with C.L.

{¶ 21} B.D's negative behaviors escalated in February 2022. B.D.'s "suicidal ideations and * * * her behaviors in general [were] progressing. * * * [I]nstead of getting better, she is kind of regressing and getting worse in a way." (Tr. 110.) During one incident, police had to escort B.D. to the hospital because she was biting and kicking the EMS workers. The social worker did not believe Mother or Father B.D. could meet B.D.'s behavioral and mental health needs. Also a pending felonious assault charge against Father B.D. that reportedly involved a female victim was discovered by the agency during a review of the criminal case dockets.

{¶ 22} The social worker confirmed that Foster Mother was authorized to manage parental visitation with the children but the social worker had not had a chance to observe the visits. Both parents expressed love for the children and said they wanted what was best. C.L. preferred to remain with Foster Mother if family members were not an option and he was not interested in adoption. B.D. was willing to stay with Foster Mother but also said she wanted to be with family or with Father B.D. Foster Mother was willing to have C.L. remain until the age of 18 but requested removal of B.D. at the end of the school year. B.D.'s next placement would depend on the level of care needed.

{¶ 23} Neither Mother nor Father B.D. appeared for the second day of trial. Counsel was unable to reach their clients by phone and each requested a short continuance. The continuance was denied.

{¶ 24} The final witness was the children's GAL who had been on the case since March 2020. The GAL recommended awarding permanent custody of C.L. to

the agency and stated that Mother's sincere desire to parent C.L. was not outweighed by her ongoing substance abuse and mental-health issues. The GAL lauded the efforts of Foster Mother and stated that C.L. was doing well with her and should remain.

{¶ 25} The GAL also spoke well of Father B.D. and recommended that legal custody be granted to Father B.D. However, the GAL admitted that his interaction with Father B.D. occurred only several months prior to trial, the living conditions were not ideal, and Father B.D.'s work schedule was erratic. A caregiver would be required to assist with B.D. whose behavioral and mental health issues were substantial. Father B.D.'s pending criminal case could also be an impediment.

{¶ 26} The juvenile court awarded permanent custody of the children to CCDCFS. Mother appeals.

## III. Assignment of Error:

{¶ 27} Mother assigns the following error:

The juvenile court abused its discretion by granting permanent custody of appellant's children to CCDCFS against the manifest weight of the evidence.

## IV. Law and Analysis

{¶ 28} The juvenile court has been vested with exclusive jurisdiction to determine the custody of any child not a ward of another court of this state. R.C. 2151.23(A)(2). "Parents have a 'fundamental liberty interest' in the care, custody and management of the child." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388,

71 L.Ed.2d 599 (1982). "A parent's right to raise a child is 'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). The right is not absolute but is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 29} The decision of a juvenile court to grant permanent custody will not be reversed as being against the manifest weight of the evidence where the record contains competent, credible evidence that the essential statutory elements for permanent custody have been established by clear and convincing evidence. *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 30} "'Clear and convincing evidence'" is that measure or degree of proof that is more than a "'preponderance of the evidence,'" but does not rise to the level of certainty required by the "'beyond a reasonable doubt'" standard in criminal cases. *In re K.S.*, 8th Dist. Cuyahoga No. 109928, 2021-Ohio-694, ¶ 15, quoting *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 15, citing *In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994), citing *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 180-181, 512 N.E.2d 979 (1987). It "produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re M.S.* at ¶ 8.

{¶ 31} The agency moved for custody under R.C. 2151.413(A) and 2151.414. R.C. 2151.414 contains a two-prong test that courts must apply in deciding whether to award permanent custody to the agency. In this case, the record must demonstrate by clear and convincing evidence "(1) the existence of one of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e); and (2) [that] granting permanent custody to the agency is in the best interest of the child" under R.C. 2151.414(D)(1). *In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 45 (8th Dist.).

{¶ 32} When determining the child's best interest pursuant to R.C. 2151.414(D)(1), courts analyze "(1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply." *In re S.H.*, 8th Dist. Cuyahoga Nos. 97992, 97993, and 97994, 2012-Ohio-4064, ¶ 28.

{¶ 33} The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d at 315, 642 N.E.2d 424. "The discretion [that] the juvenile court enjoys in [deciding] whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned." *Id.* at 316.

{¶ 34} Thus, we review "a trial court's determination of a child's best interest under R.C. 2151.414(D) for abuse of discretion." *In re V.C.*, 8th Dist. Cuyahoga

Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 52, citing *In re L.O.*, 8th Dist. Cuyahoga No. 101805, 2015-Ohio-1458, ¶ 22. "An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d at 219, 450 N.E.2d 1140 (1983).

### A. B.D. Findings

#### 1. R.C. 2151.414(B)(1)(a)-(e) Conditions

{¶ 35} Only one of the five factors listed in R.C. 2151.414(B)(1)(a)-(e) is required to satisfy the first prong of the permanent custody analysis. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 36} The juvenile court determined that, based on clear and convincing evidence under R.C. 2151.414(B)(1)(a), B.D. "cannot be placed with either of [her] parents within a reasonable time or should not be placed with [her] parents." Journal entry No. 0915782461, p. 2. (May 31, 2022). The 16 factors listed in R.C. 2151.414(E) must be consulted to determine whether a child cannot or should not be placed with the parents within a reasonable time.

{¶ 37} The juvenile court made the following findings as to why B.D. could not or should not be placed with Mother:

> (1) Following the placement of [B.D.] outside of [her] home and notwithstanding reasonable case planning and diligent efforts by the agency to assist Mother to remedy the problems that initially caused [B.D.] to be placed outside the home, Mother has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home;

> (2) [Mother's] chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency * * * is so severe that it makes [Mother] unable to provide an adequate

permanent home for the child at the present time and, as anticipated, within one year.

(4) [Mother] has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(6) [Mother] has been convicted of or pleaded guilty to an offense under [R.C. 2919.22(A), child endangering] * * * and the child or a sibling of the child was a victim of the offense * * * and [Mother] who committed the offense poses an ongoing danger to the child or a sibling of the child.

(14) [Mother] for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) [Mother] has committed abuse as described in section 2151.031 of the Ohio Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Ohio Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with [Mother] a threat to the child's safety.

(16) Any other factor the Court finds relevant: Mother is in agreement with legal custody to father. Father has a pending criminal case for felonious assault with firearm specifications, which allegedly occurred in December 2021.

Journal entry No. 0915782461, p. 3 (May 31, 2022).

{¶ 38} Notwithstanding that the single factor has been satisfied, the juvenile court also found under R.C. 2151.414(B)(1)(e) that B.D. has been adjudicated an abused, neglected, or dependent child on three prior occasions, that returning to Mother's home would be contrary to B.D.'s best interest, and

that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to

the family include: Mother was referred for Substance Abuse and Housing Services. * * * Child receives mental health services.

Journal entry No. 0915782461, p. 2 (May 31, 2022).

## 2. R.C. 2151.414(D)(1) Best Interest Factors

**{¶ 39}** The juvenile court considered the following R.C. 2151.414(D)(1) factors. Under R.C. 2151.414(D)(1)(a), B.D. had been with the caregiver for over two years and had a relationship and bond with Foster Mother. Under R.C. 2151.414(D)(1)(b), the juvenile court considered the wishes of B.D. directly or through the GAL. Under, R.C. 2151.414(D)(1)(c), B.D. had been in agency custody for over two years on this case, which is the fourth time B.D. had been in agency custody. Further, under R.C. 2151.414(D)(1)(d), the juvenile court found that a legally secure permanent placement could not be achieved without a grant of permanent custody. Mother had not engaged in or benefitted from case plan services, including substance abuse compliance that has been a concern with Mother since 2012.

**{¶ 40}** Finally, as to Mother's argument that the juvenile court should have awarded custody of B.D. to Father B.D., "[i]t is well settled that an appeal lies only on behalf of an aggrieved party." *In re J.L.*, 8th Dist. Cuyahoga No. 107652, 2019-Ohio-3098, ¶ 14, citing *In re Love*, 19 Ohio St.2d 111, 113, 249 N.E.2d 794 (1969). *See also In re D.H.,* 8th Dist. Cuyahoga No. 82533, 2003-Ohio-6478, ¶ 7. It is true that "[a] mother, who has an interest in preserving parental rights at a permanent custody hearing, has standing to raise an argument on behalf of the father if she can demonstrate personal prejudice." *In re U.G.*, 9th Dist. Summit No. 30193, 2022-

Ohio-3905, ¶ 29. However, the record does not support the presence of personal prejudice in this case. This is particularly true in that Father B.D. has lodged a direct appeal on this matter.

**B. C.L. Findings**

**1. R.C. 2151.414(B)(1)(a)-(e) Conditions**

{¶ 41} The juvenile court found by clear and convincing evidence under R.C. 2151.414(B)(1)(a) that C.L. "cannot be placed with either of [his] parents within a reasonable time or should not be placed with [his] parents." Thus, the 16 factors listed in R.C. 2151.414(E) must be consulted to determine whether a child cannot or should not be placed with the parents within a reasonable time.

{¶ 42} The juvenile court made the following findings under R.C. 2151.414(E) as to why C.L. could not or should not be placed with the parents:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, [Mother] has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(2) The chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of [Mother] is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year.

(4) [Mother] has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(6) [Mother] has been convicted of or pleaded guilty to an offense under [R.C. 2919.22(A), child endangering] * * * and the child or a sibling of

the child was a victim of the offense * * * and [Mother] who committed the offense poses an ongoing danger to the child or a sibling of the child.

(14) [Mother] for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) [Mother] has committed abuse as described in section 2151.031 of the Ohio Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Ohio Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

Journal entry No. 0915782295, p. 3 (May 31, 2022).

{¶ 43} Notwithstanding that the single factor has been satisfied, the juvenile court also found under R.C. 2151.414(B)(1)(e) that C.L. had been adjudicated an abused, neglected, or dependent child on three prior occasions. The juvenile court also found that returning to Mother's home would be contrary to C.L.'s best interest and

that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include: Mother was referred for Substance Abuse and Housing Services. The Father did not make himself available to the Agency. The child receives mental health services.

Journal entry No. 0915782295, p. 2 (May 31, 2022).

### 2. R.C. 2151.414(D)(1) Best Interest Factors

{¶ 44} The juvenile court also considered the best interest factors. Under R.C. 2151.414(D)(1)(b), the juvenile court considered the wishes of C.L. with due regard for C.L.'s maturity and the GAL's recommendation of permanent custody.

Under R.C. 2151.414(D)(1)(c), C.L. had been in agency custody since February 2020 and this is the third time C.L. has been in agency custody. Further, under R.C. 2151.414(D)(1)(e), the juvenile court determined that R.C. 2151.414(E)(10) applied to Father C.L.'s abandonment of C.L.

## V. Conclusion

{¶ 45} The goal of the extremely difficult task of terminating parental rights is to create "'a more stable life' for dependent children and to 'facilitate adoption to foster permanency for children.'" *In re S.B.*, 8th Dist. Cuyahoga Nos. 110016 and 110017, 2021-Ohio-1091, ¶ 35, quoting *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 46} The record contains competent, credible evidence that the essential statutory elements for permanent custody have been established by clear and convincing evidence. The juvenile court did not abuse its discretion by finding that permanent custody was in the best interest of the children. The decision was not against the manifest weight of the evidence, and Mother's single assigned error is overruled.

{¶ 47} The juvenile court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
MICHAEL JOHN RYAN, J., CONCUR