[Cite as *In re N.B.*, 2015-Ohio-314.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101390**

**IN RE: N.B. AND A.B.**
**Minor Children**

**JUDGMENT:**
REVERSED, VACATED AND REMANDED

Civil Appeal from the
Cuyahoga Court of Common Pleas
Juvenile Division
Case Nos. AD 13910425 and AD 13910426

**BEFORE:** Jones, P.J., Keough, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** January 29, 2015

**ATTORNEYS FOR APPELLANT**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Michelle A. Myers
       Pamela A. Hawkins
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEES**

**For NiB., The Mother**

Robert L. Tobik
Cuyahoga County Public Defender

BY: Brant N. Dichiera
Assistant County Public Defender
9300 Quincy Avenue, 3rd Floor
Cleveland, Ohio 44106

BY:   Cullen Sweeney
Assistant County Public Defender
310 Lakeside Avenue
Cleveland, Ohio 44113

**For J.B., The Father**

Thomas Kozel
P.O. Box 534
North Olmsted, Ohio 44070



**For The Children**

Stephanie L. Lingle
526 Superior Avenue
Suite 1030
Cleveland, Ohio 44114

**For Guardian Ad Litem**

Gregory T. Stralka
6509 Brecksville Road
P.O. Box 31776
Independence, Ohio 44131


LARRY A. JONES, SR., P.J.:

**{¶1}** The Cuyahoga County Division of Children and Family Services ("CCDCFS" or the "Agency") appeals from the juvenile's court dispositional order granting Mother legal custody of N.B. and A.B. (collectively "Children") with the Agency's protective supervision. Mother and the Children, through their respective attorneys, have filed briefs in this appeal requesting affirmance of the trial court's order, or alternatively, for an order of temporary custody. Father has not appeared. We reverse and remand.

## I.   Procedural History

**{¶2}** On July 19, 2013, 11-year old N.B. and 9-year old A.B. were removed from Mother's care pursuant to a telephonic order of removal. On July 22, 2013, the Agency filed a complaint, in which it alleged that the Children were neglected and sought permanent custody of them; the Agency also filed a motion seeking emergency custody of the Children. The trial court held a hearing on the emergency motion that same day, and granted CCDCFS emergency pre-dispositional custody of N.B. and A.B.

**{¶3}** On August 20, 2013, CCDCFS filed a case plan.[1] An adjudicatory hearing was held on October 3, 2013. At the hearing, Father admitted to the allegation in the complaint that he was currently incarcerated and awaiting trial on theft, aggravated theft, and burglary charges. At the conclusion of the hearing, the trial court adjudged the Children to be neglected and continued the matter for disposition.

**{¶4}** On October 7, 2013, Mother filed a motion for an in camera interview of the Children; the trial court granted the motion and held the interview on October 21, 2013, which was the date also scheduled for the dispositional hearing. However, based on the interview, the

---

[1]An amended case plan was filed on October 9, 2013.

trial court continued the dispositional hearing and appointed counsel for the Children. On November 13, 2013, the Children's attorney filed a motion seeking to grant temporary custody to the Agency.

{¶5} The dispositional hearing was held on April 25, 2014. After the hearing, the trial court issued its judgment granting Mother legal custody with the Agency's protective supervision.

{¶6} In CCDCFS's sole assignment of error, it contends that, "[t]he trial court's order committing the children to the legal custody of Mother was against the manifest weight of the evidence and an abuse of discretion."

II.   Facts

**Background History**

{¶7} The family's involvement with CCDCFS began in 2001, the year N.B. was born. At birth, N.B. was removed from Mother's care because both he and Mother tested positive for heroin.    On April 11, 2002, N.B. was adjudicated dependent and placed in temporary custody. A case plan was developed for Mother, which she completed, and approximately 14 months later, in October 2002, N.B. was reunified with her.

{¶8} In June 2003, N.B. was again removed from Mother's care after being hospitalized in the intensive care unit with a bacterial infection caused by a severe eczema flare up; he was subsequently adjudicated neglected. At this time, Mother began treatment with Community Action Against Addiction ("CAAA").

{¶9} In October 2003, Mother gave birth to A.B., who tested positive for methadone, a drug frequently used in the treatment of heroin addiction. A.B. was adjudicated dependent and she was placed in the Agency's temporary custody; she was placed with N.B. who, at the time,

was also in the Agency's custody. Father, who also had a heroin abuse problem, was incarcerated at the time of A.B.'s birth.

{¶10} Following successful completion of the Agency's case plan, both Children were reunified with Mother in February 2005, subject to protective supervision. At that time, N.B. had been in the Agency's custody for 20 months, and A.B. for 16 months.

{¶11} During the period of protective supervision, the Agency received several referrals regarding lack of medical care for N.B. The family was provided with medical education, sobriety monitoring, parenting education, and case management services.

{¶12} Protective supervision ended in the beginning of 2006, and Mother and Children lived together without involvement from CCDCFS until 2008 when Mother and Father took N.B. to the hospital for treatment of his chronic eczema; he had to have surgical drains to treat his condition. No further complaint was filed by the Agency, but a social worker visited with the family upon N.B.'s discharge from the hospital and offered services.

{¶13} In October 2012, CCDCFS received a referral indicating that Mother and Father were abusing drugs in front of the Children. The allegations were not substantiated and, hence, no action was taken.

**This Case:  Emergency Removal**

{¶14} On July 19, 2013, CCDCFS social worker Mary Holzheimer went to the Economy Inn and Suites in North Olmsted, Ohio, where the family was living, to investigate allegations of neglect relative to N.B. and A.B. Specifically, the allegations were that the Children were often left alone and unsupervised during the day, and that N.B. had open sores on his body, "clumps of bugs" in his hair, and was constantly itching.

{¶15} Upon arriving at the Inn, Holzheimer found N.B. and A.B. alone in the family's motel room. Holzheimer spoke with neighbors and the property manager and learned that the Children were unsupervised.

{¶16} Holzheimer called Mother and explained the referral and allegations about the Children that the Agency had received. Mother responded that the Children were fine and well-cared for, and that it was going to be awhile before she arrived home. Holzheimer told the Mother that it was important that she come home, and in addition to her first call to Mother, Holzheimer placed two more to her. Mother arrived home approximately one hour and ten minutes after Holzheimer's first call to her.

{¶17} Holzheimer testified that N.B.'s legs were almost entirely covered with scabs, some of which were welt-like and bleeding. His socks were bloody and his face was bright red. Holzheimer also observed that the skin on his wrists had sores and was wrinkled. Because of the severity of his condition, Holzheimer told Mother that N.B. needed to go the emergency room. Mother initially resisted, but upon Holzheimer's persistence, eventually agreed.

{¶18} The emergency room physician diagnosed N.B. with acute eczema and scabies. He was treated with steroids and released from the hospital later that evening. The emergency room personnel expressed concerns regarding N.B.'s hygiene and Mother's lack of follow through with his care.

**N.B.'s Care**

{¶19} Upon further investigation, Holzheimer learned that N.B. had two doctors treating him for his eczema: his primary care physician, Dr. James Liang, and his dermatologist, Dr. Brandie Tackett-Styron.

**{¶20}** Holzheimer learned that Mother had taken N.B. to Dr. Liang on July 16, 2013, three days prior to his removal from her care. Dr. Liang noted at that visit that N.B. had severe eczema over the entirety of his body and that it was the worst case he had seen in his 30-year practice of medicine.

**{¶21}** Dr. Liang had been N.B.'s doctor since 2008. At a May 2011 appointment N.B. had with him, he noted that N.B.'s whole body was very red with scratches and he had run out of medicine. He recommended that Mother follow-up with him in two weeks. Mother did not, however, and the next visit did not take place until two years later in May 2013. Dr. Liang also saw N.B. in June 2013. For 2013, Dr. Liang saw N.B. a total of three times.

**{¶22}** Dr. Tackett-Styron had been N.B.'s dermatologist since 2011. Dr. Tackett-Styron testified that she would typically see a patient with severe eczema, such as N.B. had, every one to three months. She recommended this course of treatment for N.B. to Mother, but Mother was noncompliant, so she eventually recommended six-month follow-up appointments. The doctor testified that since she started treating N.B. in 2011, he had 20 scheduled appointments, but only attended six of them.

**{¶23}** At one of the appointments, in April 2013, Dr. Tackett-Styron saw N.B. for a routine eczema follow-up exam and found that he had a severe eczema flare up. She prescribed topical ointments, syrup for his itching, and an antibiotic because his skin had become infected. She also recommended that N.B. take diluted bleach baths three times a week, which is a routine treatment for eczema. N.B. was unable to tell Holzheimer when the last time he had bathed was, however.

**{¶24}** Dr. Tackett-Styron concluded that based on the number of missed appointments, lack of requests for prescription refills, and lack of improvement in N.B.'s condition, Mother had failed to consistently follow the treatment plan for N.B.

**N.B. and A.B.'s Relationship**

**{¶25}** In addition to N.B.'s skin condition, he also had developmental and learning delays. The record demonstrates that N.B. and A.B. were closely bonded and, that, despite being the younger sibling, A.B. "took care" of N.B.

**Case Plan**

**{¶26}** Matthew Goodwin, a social worker for the Agency, was assigned to the case in July 2013. Goodwin testified that when the children were removed from Mother's care in July 2013, Mother and Father were provided with a case plan in an attempt to achieve reunification. For both parents, the plan included substance abuse objectives, mental health services, parenting education, housing, and basic needs.

**Mother's Plan**

**{¶27}** Relative to the substance abuse objective for Mother, the Agency requested that she complete drug screens due to her nearly 20-year history of heroin abuse. Specifically, CCDCFS initially requested that she submit to a complete urine screen at the initial staffing, the emergency custody hearing, and five days later at the case plan meeting. Mother failed, however, to complete any of the screenings. On August 13, 2013, Mother did submit to a urine drug screen and hair follicle sample; they both tested positive for heroin, codeine, and morphine.

**{¶28}** Mother, however, denied drug use to Goodwin and maintained that the tests were wrong. She stated that she was treating at CAAA. Goodwin attempted to verify her treatment there, but Mother revoked her release, and Goodwin was not able to obtain any information.

{¶29} Mother later digned a release, however, and Goodwin was able to obtain her treatment records from CAAA. The records revealed that from May 2013 to July 2013, Mother had tested positive for opiates on several occasions. She had also tested positive for heroin on several prior occasions.

{¶30} Goodwin testified that Mother's positive drug screens were of significant concern to him, in particular, because her drug of choice for decades, despite treatment, was heroin, and she appeared to be in denial about her use and relapse. He had concerns about her motivation and willingness to get treatment, as well as her ability to maintain sobriety. Nonetheless, he encouraged Mother to use drug treatment services, and continued to monitor her sobriety with random drug screens and hair follicle tests.

**Father's Plan**

{¶31} Father admitted to Goodwin that he had a 20-year history of heroin use. Father also has a criminal history dating back to 1987 and which continued up to the time of the dispositional hearing in 2014. When N.B. was born in 2001, Father was incarcerated. He was also incarcerated in 2003 when A.B. was born. He has been incarcerated throughout both children's lives.

{¶32} His more recent criminal history includes a 2007 vandalism and breaking and entering conviction, for which he was sentenced to one year of community control sanctions. The sanctions included random drug screens, outpatient drug treatment, and participation in alcoholic, narcotics, and cocaine anonymous meetings.

{¶33} In 2010, Father was convicted in three separate cases of attempted robbery with specifications, and two counts of theft. In each case, community control sanctions were

imposed on Father, which included inpatient treatment and aftercare, regular drug testing, and attendance at alcoholic, narcotics, and cocaine anonymous meetings. Father violated the conditions of the sanctions, and was sentenced to 18 months in prison.

**{¶34}** In 2012, Father was convicted of drug possession and received a suspended sentence of six months and community control sanctions which included drug testing. In 2013, he was convicted of two counts of aggravated theft and received a suspended sentence of nine months and community control sanctions, which included inpatient treatment at a community based correctional facility and random drug testing.

**{¶35}** In February 2014, Father was convicted of drug possession and received a suspended sentence of 11 months and was placed on community control sanctions for two years and ordered to submit to random drug testing. At the time of the 2014 dispositional hearing, Father had a pending theft charge in municipal court.

**{¶36}** At the time of the dispositional hearing, Father had completed inpatient treatment at a community based correctional facility and was in an aftercare program at Recovery Resources. He had also completed a mental health assessment at Recovery Resources and had been diagnosed with bipolar disorder and post-traumatic stress disorder; he was also being treated at Recovery Resources for the dual diagnosis, and medications were recommended.

**{¶37}** Father's Recovery Resources service provider noted that Father had an extremely high potential for relapse due to his extensive substance abuse history and mental health issues. The service provider noted that at the time of the dispositional hearing Father was in the "very early stages" of recovery.

**{¶38}** Because of Father's substance abuse history, the Agency requested that he submit to random drug screens and hair follicle samples, in addition to other screens that he had submit

to either for the probation department or treatment. On January 14, 2014, Goodwin requested that Father complete a urine drug screen and hair follicle test; Father did not comply until January 22, 2014.

{¶39} On March 21, 2014, Goodwin made another request of Father for a urine screen and hair follicle test. Father refused to complete the hair follicle test and the urine sample that he submitted was diluted.[2] Given Father's long history of heroin use, Goodwin expressed concern that his failure to complete the hair follicle test and submission of a diluted urine sample could indicate that he was using drugs again and was attempting to avoid detection.

{¶40} Thus, although Goodwin acknowledged that Father had made some progress, given Father's background, Goodwin concluded that the progress was not sufficient enough to recommend reunification.

**Visitation**

{¶41} After the children were placed into the Agency's custody, the parents were allowed supervised visitation at the Agency with them. Mother consistently visited with the children. Goodwin observed the visits and testified that Mother interacted fairly well with them, but that there was a lack of emotion on Mother's part and she seemed very "flat." In November 2013, after he had been released from incarceration, Father started his visitation.

**N.B.'s Care Since in Custody**

{¶42} Since the children's July 2013 placement in the Agency's custody, N.B.'s eczema markedly improved with the same course of treatment that had previously been prescribed for Mother to follow. N.B., who has developmental and learning delays, was given an

---

[2]Father submitted a mouth swab drug screen to his probation officer on March 20, 2014, that was inconclusive.

Individualized Education Plan. He also had a 16 percent weight gain since being placed in custody.

**Children's Time in Custody**

**{¶43}** At the time of the dispositional hearing, N.B. had spent approximately 48 months of his life in the Agency's custody and A.B. had spent approximately 23 months of her life in the Agency's custody.

**Goodwin's Recommendation**

**{¶44}** Goodwin recommended that the Agency be given permanent custody of the children. His recommendation was based on his belief that Mother and Father were unable to safely parent the children within a reasonable period of time. According to Goodwin, the parents were having a hard time dealing with their own issues, and he believed that returning the children to them would be too complicated for them and further delay the limited progress they had made. Goodwin was concerned in particular about the parents' inability to maintain sobriety.

**GAL's Recommendation**

**{¶45}** The children's GAL also recommended that the children be placed in the permanent custody of the Agency. Of particular concern to the GAL was Father's continued criminal involvement and questionable sobriety, and Mother's inability to maintain sobriety and lack of care for N.B.'s condition. The GAL was also concerned that Mother was living again with Father, whom she admitted is a relapse trigger.

**Mother, Father, and Children's Request**

**{¶46}** Through counsel, Mother, Father, and the Children requested that the Agency be granted temporary custody. The children's attorney indicated that she made the request because the children only wanted to return home when their parents were able to take care of them.

### III. Law and Analysis

**{¶47}** For its sole assigned error, CCDCFS contends that:

> The trial court's order committing the children to the legal custody of NiB., Mother, was against the manifest weight of the evidence and an abuse of discretion.

**{¶48}** An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence. *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

**{¶49}** R.C. 2151.414 sets forth a two-prong analysis for juvenile courts to apply in determining whether permanent custody should be granted to an agency. *See also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 23. First, the court must find by clear and convincing evidence one of the four factors set forth in R.C. 2151.414(B)(1). Second, the court must determine, by clear and convincing evidence, that it is in the best interest of the child to terminate parental rights. R.C. 2151.414(B)(2).

**{¶50}** Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Parsons*, 9th Dist. Lorain Nos. 97CA006662 and 97CA006663, 1997 Ohio App. LEXIS 5141 (Nov. 12, 1997).

**{¶51}** The factors under R.C. 2151.414(B)(1) include whether the child has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). It is undisputed that this factor applied for both N.B. and A.B., and the trial court made the finding. Because the factor set forth in R.C. 2151.414(B)(1)(d) had been established, the court was statutorily authorized to grant the Agency permanent custody of the Children if clear and convincing evidence existed that it was in the Children's best interest to do so. *In re V.B.-S.*, 10th Dist. Franklin No. 13AP-478, 2013-Ohio-5448, ¶ 35.

**{¶52}** With regard to the best interests of the child determination under R.C. 2151.414(B)(2), a non-exhaustive list of factors for the trial court to consider are set forth in R.C. 2151.414(D) as follows:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶53}** This court has "consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights." *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56. *See also In re P.C.*, 8th Dist. Cuyahoga Nos. 90540 and 90541, 2008-Ohio-3458, ¶ 31, citing *In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 34; *In re R.M.*, 8th Dist. Cuyahoga Nos. 99809, 99810, and 99811, 2013-Ohio-4928, ¶ 13.

**The Trial Court's Findings**

**{¶54}** Relative to both Children, the court found the following:

The parents have placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and further relapsed from treatment two or more times after a case plan issued requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

**{¶55}** Specific to N.B., the court found that the

parents have caused or allowed the child to suffer medical neglect and which reoccurred for the child such that the child's placement with the child's parent(s) remains a threat to the child's safety without supervision and strict compliance with the child's medical treatment by the parents.

**{¶56}** The court noted that despite

reasonable case planning and diligent efforts by the Agency to assist the Mother to remedy the problems associated with [N.B.'s] medical care, the Mother has failed to continuously and repeatedly * * * remedy the conditions giving rise to [his] medical neglect.

**{¶57}** Relative to A.B., the court similarly found that the

parents have caused or allowed the child to suffer neglect * * * such that the child's placement with the child's parent(s) remains a threat to the child's safety without supervision in the home.

The court noted that as a result of Mother not remedying the issues relating to the medical neglect of N.B., she "inappropriate[ly] rel[ied]" on A.B. to "provide care and supervision" for N.B.

**{¶58}** Notwithstanding the trial court's above-mentioned findings, the court concluded that a "grant of permanent custody is not in the best interests of the child[ren] and the child[ren] can be placed with one of the * * * parents within a reasonable time." In so finding, the court concluded that Mother "appears" to have remedied the conditions that caused the first two removals of N.B., and the one removal of A.B., within a shorter period of time than the other times, by "reengaging in substance abuse treatment, obtaining housing and employment to meet the basic needs" of the children.

**{¶59}** It is well-established Ohio law that the best interest determination focuses on the child, not the parent. *In the Matter of: Austin Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, *17-*18 (2000), citing *Miller v. Miller*, 37 Ohio St.3d 71, 75, 523 N.E.2d 846 (1988); *see also In re Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424 (8th Dist.1994).

**{¶60}** We review a best interest determination made under R.C. 2151.414(D) under an abuse of discretion standard. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "While a trial court's discretion in a custody modification proceeding is broad, it is not absolute, and is subject to reversal upon a showing of abuse of discretion." *Mayle* at *18, citing *Miller* at 74. A trial

court's failure to base its decision on a consideration of the best interests of the child constitutes an abuse of discretion. *In re T.W.*, 8th Dist. Cuyahoga No. 85845, 2005-Ohio-5446, ¶ 27, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).

{¶61} After careful review, we find that the trial court's judgment granting legal custody with protective supervision to Mother was not in the best interests of the children and, therefore, was an abuse of discretion.

{¶62} We acknowledge that at the time of the dispositional hearing Mother had made some progress. But in considering the children's best interest, Mother's then-recent progress had to be viewed in light of her background and the facts.

{¶63} For example, Mother, despite acknowledging that Father is a trigger for her relapse, was again living with him. Although legal custody of the children was granted to Mother, not Father, the reality of the trial court's order is that it placed the children in a perilous situation: with Father, who by the court's own findings, has a "chronic chemical dependency * * * so severe that it makes [him] unable to provide an adequate permanent home" for the children. That is so because, again per the trial court's own findings, Father "failed continuously and repeatedly to substantially remedy the problems that initially caused the [children] to be placed outside the [children's] home."

{¶64} The above-mentioned couples with Mother's heroin use dating back 20 years. Her substance abuse issues led to N.B. being removed from her care on two other occasions, and A.B. being removed from her care one other time.

{¶65} The record also demonstrates that N.B.'s medical condition was neglected while he was in Mother's care, but had dramatically improved after he was removed from her care. The neglect has resulted in N.B. being hospitalized twice, once in the intensive care unit.

**{¶66}** Finally, we also cannot overlook that none of the parties requested the court to grant legal custody to Mother: Mother, Father, and Children requested temporary custody to the Agency, and the GAL recommended permanent custody to the Agency. The Children had a bond with their parents, but not overwhelmingly so, and expressed that they wished to return to their parents' care only when they were in a position to care for them appropriately. This record does not demonstrate that the parents were so positioned.

**{¶67}** We recognize that a "parent's right to raise a child is an essential and basic civil right," *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), and the "termination of the rights of a birth parent is an alternative last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. The purpose of the termination of parental rights statutes is to make a more stable life for the dependent children and to facilitate adoption to foster permanency for children. *See In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, *5 (Aug. 1, 1986). This court does not look upon these matters lightly, and this case is certainly no exception. But in light of the above, the trial court abused its discretion in finding that it was in N.B. and A.B.'s best interest to be placed in the legal custody of Mother.

**{¶68}** Accordingly, the trial court's judgment is reversed, the order is vacated, and permanent custody of N.B. and A.B. is granted to CCDCFS.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
EILEEN T. GALLAGHER, J., CONCUR