[Cite as *In re Y.F.*, 2024-Ohio-5605.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE Y.F., ET AL. | : | No. 114140 |
| Minor Children | : | |
| [Appeal by A.S., Mother] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART; AND REMANDED

**RELEASED AND JOURNALIZED:** November 27, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23911997

### *Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and Britta Barthol, Assistant Public Defender, *for appellant* Mother.

Rachel A. Kopec, *for appellee* Father.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant-mother, A.S. ("Mother"), appeals from the juvenile court's judgment granting legal custody of her minor child ("Y.F.") to the child's paternal

grandparents. She also appeals from the juvenile court's judgment granting permanent custody of her minor child ("U.S.") to the Cuyahoga County Division of Children and Family Services ("the agency" or "CCDCFS"). Mother claims the following errors:

> 1. The trial court abused its discretion in granting legal custody of Y.F. to paternal grandparents when it was not in her best interest.
>
> 2. The trial court erred when it granted legal custody to paternal grandparents when no statement of understanding had been signed by paternal grandparents in accordance with R.C. 2151.353(A)(3).
>
> 3. The trial court erred when it awarded permanent custody to CCDCFS as the decision is against the weight of the evidence and is not supported by clear and convincing evidence.
>
> 4. The trial court abused its discretion when it granted permanent custody to the agency when a disposition of temporary custody was available.

{¶ 2} After careful review of the record and relevant case law, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Procedural and Factual History

{¶ 3} Mother is the biological parent of the minor children, Y.F. (d.o.b. Feb. 23, 2020) and U.S. (d.o.b. Oct. 18, 2023). Appellee-father, M.F. ("Father"), is the biological parent of Y.F. The alleged father of U.S. did not participate in the underlying proceedings.

{¶ 4} On May 31, 2022, Y.F. was removed from Mother's care and placed in the agency's custody pursuant to an ex parte telephonic order. On June 1, 2022, CCDCFS filed a complaint for temporary custody, alleging that Y.F. was an abused

and dependent child as defined by R.C. 2151.031(B) and 2151.04(B). In support of the complaint, CCDCFS alleged the following set of particulars:

1. Mother and alleged father, [Father], have repeatedly engaged in physical altercations in the presence of the child. On or about May 24, 2022, Mother and [Father] engaged in a physical altercation involving law enforcement, where mother attacked [Father] and threw a tiki torch at him.

2. Mother has mental health issues, specifically post traumatic stress disorder ("PTSD"), anxiety, depression, and suffers from panic attacks, which she has failed to consistently address. Mother becomes aggressive and violent when she is noncompliant with treatment. Mother is inconsistent with taking her mental health medication.

3. Mother has a substance abuse issue relating to marijuana which she has failed to appropriately address.

4. [Father] lacks appropriate judgment and parenting skills necessary to provide a safe home for the child. He has continued to maintain a relationship with mother and provided her access to the child despite her propensity for violence.

5. [Father] has criminal convictions for marijuana use and drug paraphernalia.

6. [Father] has not established paternity.

{¶ 5} Following a hearing, the child was committed to the emergency temporary care and custody of CCDCFS. By entry journalized on November 1, 2022, the child was adjudicated abused and dependent and was placed in the temporary custody of the agency. In the order, the juvenile court approved the case plans developed for Mother and Father. Each plan included objectives for mental-health, parenting-education, and domestic-violence services.

{¶ 6} The initial order of temporary custody was extended on May 29, 2023. Shortly thereafter, however, the agency filed a motion dated June 8, 2023, to modify

the order of temporary custody to an order of permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of Amy Norris ("Norris"), an extended-services worker employed by CCDCFS, who averred, in pertinent part:

1. I am the CCDCFS worker of record assigned to this family.

2. The case was assigned to me on or about June 23, 2022.

. . .

5. A case plan was filed with the Juvenile Court and approved which requires that Mother engage in domestic violence, parenting, and mental health services in addition to maintaining medication compliance and demonstrating an ability to provide for the child's basic needs.

6. Mother has not participated in domestic violence services.

7. Mother discharged herself from an anger management program prior to completion.

8. Mother participated in a parenting program but fails to demonstrate a benefit and continues to act inappropriately in front of the child.

9. Mother sporadically engages in mental health services despite diagnoses of intermittent explosive disorder, post-traumatic stress disorder, and bipolar disorder.

10. Mother is unemployed and does not have stable and appropriate housing for the child.

11. Father's case plan services require him to engage in domestic violence, parenting, and mental health services.

12. [Father] informed the agency he does not believe services are necessary. He has not engaged in any services.

13. [Father] is jailed on two counts of kidnapping, corrupting others with drugs, contaminating substance for human consumption or use, drug possession, two counts of aggravated menacing, aggravated robbery, two counts of robbery, and obstructing official business.

{¶ 7} During the pendency of Y.F.'s case, Mother gave birth to U.S. on October 18, 2023. The next day, CCDCFS filed a complaint for permanent custody of U.S., alleging that the child was dependent. The complaint set forth similar particulars identified in Y.F.'s complaint, including concerns with Mother's mental-health and anger issues. By entry journalized on January 8, 2024, U.S. was adjudicated dependent and was placed in the temporary custody of the agency. The dispositional hearing was then scheduled for March 1, 2024, to coincide with the trial on the permanent custody motion pertaining to Y.F.

{¶ 8} On December 29, 2023, Father filed a motion for second extension of temporary custody or legal custody of Y.F. to her paternal grandparents, L.F. and K.F. (together "Paternal Grandparents"). Father argued that an extension of temporary custody would be in the best interest of Y.F. because he was making "significant and substantial progress on his case plan." Alternatively, Father asserted that legal custody in favor of Paternal Grandparents was the least restrictive alternative to permanent custody.

{¶ 9} A hearing to resolve the pending motions was held over a period of three days: March 1, 2024, May 20, 2024, and May 21, 2024. On behalf of the agency, Norris testified that she is employed as an extended caseworker at CCDCFS and served as the assigned caseworker for the children. Norris outlined her familiarity with Mother and the circumstances that caused the children to be removed from her care. Y.F. was initially placed with her Paternal Grandparents through a safety plan. However, this arrangement was disrupted after the agency

determined that the Grandparents had violated the terms of the safety plan by permitting Father to have unsupervised access to Y.F. (Tr. 121-122.)

{¶ 10} U.S. was removed from Mother's care at the time of her birth based on the child's positive drug screen. (Tr. 90, 126.) Y.F. and U.S. do not have the same biological father. U.S.'s biological father is unknown and, therefore, CCDCFS was unable to contact him during the underlying proceedings.

{¶ 11} Following Y.F.'s removal from Mother's care, CCDCFS developed a case plan for reunification to assist Mother in addressing the issues that led to the children's removal. The case plan included services to address concerns relating to mental health, substance abuse, basic needs, parenting, and domestic violence. Specifically, the case plan required Mother to (1) attend, participate, and successfully complete a domestic-violence program; (2) actively participate and complete any mental-health treatment recommendations; (3) take all medications as prescribed; (4) complete a drug and alcohol assessment, engage in any recommended services, and submit to random urine screens; and (5) attend, actively participate, and successfully complete a parenting program.

{¶ 12} The agency also developed a case plan for Father, that required him to complete services to address ongoing concerns with mental health, basic needs, parenting, and domestic violence. Father was incarcerated at the time of trial and was serving a four-year prison sentence. Prior to his incarceration, Father did not cooperate with CCDCFS and refused to complete the recommended services. Thus,

Norris testified that Father did not successfully complete his case-plan objectives. (Tr. 85-89, 181, 184, 191, and 251.)

{¶ 13} With respect to Mother's case-plan objectives, Norris testified that Mother is currently unemployed but receives food stamps and Supplemental Security Income in the amount of $940 per month. Mother also has obtained appropriate housing through services provided by the Lakewood Collaborative and is residing in a two-bedroom apartment. Nevertheless, the agency has ongoing concerns with Mother's ability to provide for the children's basic needs because her monthly income is less than her monthly rent obligation. Norris further stated that Mother "wasn't always able to provide food or things like that for the children" during scheduled visits. (Tr. 92.)

{¶ 14} Regarding the substance-abuse component of the case plan, Norris testified that Mother was required to complete a substance-abuse assessment based on her reported marijuana use. Norris confirmed that Mother did submit to random drug screens. However, Mother tested positive for drugs in February 2023, and confirmed that she was "still using" during the agency's semiannual administrative review meeting. Mother's records indicate that she was using marijuana "seven days per week" as of May 2024. (CCDCFS exhibit No. 7; tr. 107.)

{¶ 15} Norris testified that mental-health components were included in Mother's case plan because she was diagnosed with "PTSD, Anxiety Disorder, Cannabis Use Disorder, and Intermittent Explosive Disorder." (Tr. 97.) Mother was referred for a mental-health assessment with Signature Health but was inconsistent

with her engagement. Mother withdrew from counseling services in August 2022 "because she was non-compliant." (Tr. 95.) Between August 2022 and September 2023, Mother only attended one mental-health appointment and did not otherwise participate in mental-health services despite the agency's continued efforts. Between September 2023, and the date of trial, Mother was "inconsistent" in taking her prescribed medications and her engagement with the mental-health aspect of her case plan was "sporadic." (Tr. 132.) Norris further testified that Mother continued to exhibit troubling behaviors in the presence of the children. For instance, Mother had a "violent outburst" in the hospital following U.S.'s birth and had to be monitored closely "due to safety concerns." (Tr. 99.) Norris testified that Mother's troubling behavior was consistent "throughout the life of the case." (Tr. 102.) Mother was often unable to control her "rage and anxiety" and was prone to "yell" and "cuss" at agency employees "when something wouldn't go her way." (Tr. 101-102.) Thus, Mother's mental-health records dated April 9, 2024, noted that "the overall impression of treatment demonstrates minimal improvement as evidenced by ongoing challenges in managing stress using health coping strategies." (CCDCFS exhibit No. 7; tr. 105.)

{¶ 16} Norris conceded that Mother has recently reengaged with Signature Health on a more consistent basis and has shown some "moderate improvement." (Tr. 95, 131-132.) Nevertheless, Norris opined that despite Mother's recent efforts to engage in her mental-health counseling, she was not benefiting from the services because she was still "showing the same behaviors to us." (Tr. 131-132.) Thus, the

agency had ongoing mental-health concerns for Mother "due to her diagnosis" and "her continued behaviors throughout the life of the case." (Tr. 110.)

{¶ 17} Mother's case plan provided supervised visits with the children on a weekly basis. Norris testified that Mother did not attend all scheduled visits and there were long stretches where visits with the children did not occur. When Mother did attend scheduled visits, she "struggles" to care for both children at the same time and does not "always know what to do with [U.S.] during the visits." (Tr. 116.) Mother also exhibited concerning behavior during several of the visits, including aggressive and verbal outbursts in front of the children. On one occasion, Mother was asked to leave the Lakewood Collaborative due to her verbal outbursts. (Tr. 114-115.) On another occasion, Mother became extremely upset after Y.F. began to undress herself after having an accident in the restroom. Norris testified that Mother ran towards Y.F., causing them to fall into the wall together. Mother then picked. Y.F. up "very physically, and then [Y.F.] got scared." Y.F. hid under the table and Mother did not engage with the children during the remainder of the visit. Rather, Mother "continued to be very verbally aggressive" towards Norris, causing Norris to end the visit early. (Tr. 112-113.) As a result of this incident, Y.F.'s therapist, Constance Oliphant ("Oliphant"), sent a letter dated April 15, 2024, to the court recommending that Y.F.'s visitation with Mother be limited or ceased based on Y.F.'s disclosures that she was angry, sad, and fearful of Mother. (Tr. 54-56 and 63.) Norris testified that the agency has consistently warned Mother that her behavior was negatively affecting the children. Since these conversations occurred,

however, there has not "been a change in behavior at visits for Mother." (Tr. 115.) Thus, Mother was never given an opportunity to participate in unsupervised visits with the children. (Tr. 116.)

{¶ 18} The children's foster parent, L.A., testified that Y.F. is often "violent" and "emotional" in the days immediately following visits with Mother. L.A. stated that Y.F. often hits, bites, or pushes other children at daycare after visiting Mother. These behaviors typically improve as the week progresses. Oliphant explained that Y.F.'s defiant or aggressive behaviors after visits were triggered by fear, anxiety, or trauma. (Tr. 57.) Y.F. expressed being "afraid" of Mother and not wanting to return to her home. (Tr. 48.) During a three-month period in 2023 when Mother did not participate in visits with Y.F., the child's behavior improved, and she was not showing any unusual aggression and was potty trained. (Tr 21-22, and 189-190.) When the visits resumed, however, Y.F. regressed in her potty training and resumed her confrontational behaviors. (Tr. 21-22.) Just two days before the dispositional hearing, Y.F. had a "panic attack" after a visit with Mother. L.A. testified that Y.F. "rolled herself up in a ball, started crying, screaming," and indicated that she was fearful she would have to return to Mother's care. (Tr. 14.)

{¶ 19} Concerning the domestic-violence and parenting components of the case plan, Norris confirmed that Mother voluntarily participated and completed domestic-violence and parenting classes. The agency did not have ongoing concerns with domestic violence but indicated that Mother did not benefit from the parenting services based upon her interactions with the children during visitation.

{¶ 20} At the time of trial, the children were living together with a foster family. The agency made regular visits to the foster home and found it to be a safe and stable home. Norris testified that the children have formed a strong relationship with the foster parents and that there were no concerns with the foster family's ability to provide ongoing care for the children. The children have also developed a strong bond with each other, and Y.F. loves her younger sibling. (Tr. 120.) Y.F. has expressed that she feels safe in her current placement and wants to remain in the foster family's care. (Tr. 49-50.) In contrast, Y.F. has expressed a fear of Mother, stating that "she does not feel safe around mom." (Tr. 48, 50, 60, and 63.)

{¶ 21} Finally, Norris was cross-examined at length regarding Y.F.s relationship with Paternal Grandparents. While in the agency's temporary custody, Paternal Grandparents began supervised visits with Y.F. in the spring of 2023. (Tr. 148.) Norris did not have any concerns with the child's interactions with Paternal Grandparents during these visits. Norris further agreed that Paternal Grandparents have an appropriate home and can meet the basic needs of Y.F. However, Norris stated that the visits with Paternal Grandparents stopped in September 2023, after Y.F. characterized Paternal Grandfather as the "monster" in her nightmares and started "displaying some sexual behavior after the visits." (Tr. 23, 26, 78, 124, and 230.) Norris confirmed that Y.F.'s behavior was especially troubling because Paternal Grandfather was previously investigated by the agency following allegations of sexual abuse against Y.F. The allegations were later deemed "unsubstantiated." (Tr. 158.)

{¶ 22} On redirect examination, Norris explained that the sexual-abuse investigation began after Y.F. was diagnosed with a severe yeast infection and displayed sexualized behaviors at a doctor's appointment when she first came into the agency's care. (Tr. 19, 157-158, 162, 173, 192-193, and 198.) Although an agency investigation resulted in a disposition of unsubstantiated, the agency remained concerned with Paternal Grandparents based on the nature of Y.F.'s behaviors following visits with Paternal Grandparents. According to Norris, Y.F.'s behaviors were not normal or age-appropriate and were described as displaying evidence of past sexual trauma. (Tr. 200-201, 204.) Finally, Norris testified that Y.F.'s sexualized behaviors "decreased after the visits stopped with the grandpa." (Tr. 202 and 210.)

{¶ 23} At the close of the agency's case, Paternal Grandparents testified on behalf of Father. Paternal Grandmother testified that before Y.F. was placed in the agency's custody, she and her husband had a "pretty close day-to-day relationship" with the child. (Tr. 237.) Y.F. lived with the Paternal Grandparents for the first six weeks of her life, and Y.F. developed a very close relationship with Paternal Grandfather. After Y.F. returned to her parent's care, she had weekly sleepovers at Paternal Grandparents' home. Before the agency received temporary custody of Y.F., the child was placed in the Paternal Grandparents' home after she was removed from Mother's care. Paternal Grandmother testified that she and her husband did not intentionally violate the agency's safety plan when they left Y.F. in Father's care. She explained that she was not aware a safety plan was in place or that Father was

not permitted to have access to the child. Paternal Grandparents have had approximately five supervised visits with Y.F. since she was placed with a foster family. (Tr. 245.) Paternal Grandmother confirmed that she was aware of the sexual-abuse allegations levied against her husband. However, she had no concerns with her husband taking care of Y.F. and believed it was in the child's best interest to be placed in their legal custody.

{¶ 24} Paternal Grandfather reiterated much of his wife's testimony, stating that he and his wife shared a close relationship with Y.F. and believed it was in the child's best interest to be returned to their care. Paternal Grandfather also testified that he did not intentionally violate the agency's safety plan and was under the impression that only Mother was prohibited from having access to Y.F. Paternal Grandfather first learned of the sexual-abuse allegations levied against him in August 2022. Paternal Grandfather vehemently denied the allegations, stating that he never touched Y.F. in a sexual way or ever did anything inappropriate to her. The investigation concluded in December 2022, and Paternal Grandfather was notified that "it was unfounded, case closed, nothing here." (Tr. 284.) Thereafter, Paternal Grandparents were permitted to visit Y.F. twice in August 2023. The visits were stopped, however, after Y.F. engaged in "concerning behavior" after each visit with Paternal Grandparents. (Tr. 311.) On cross-examination, Paternal Grandfather conceded that he pleaded guilty to public indecency after exposing himself to a "20-something" year old woman. (Tr. 317.)

**{¶ 25}** At the close of the hearing, the court heard from the children's guardian ad litem, Christina Joliat, Esq. (the "GAL"). Consistent with her written report, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL summarized her position as follows:

> I do not have enough information about the grandparents. I have concerns, but I don't have any information alleviating those concerns to recommend a change of my recommendation, so I am recommending permanent custody.
>
> I know that mother has been engaged in case plan services. She has had a couple of hurdles throughout this case.
>
> She becomes pregnant with [U.S.] and had some housing challenges.
>
> She has been able to maintain her current housing.
>
> My concern is really about visitation, that there are still ongoing incidents and concerns for supervised visitations when there are three adults present on a regular basis.
>
> And I am concerned about what would happen, you know, I mean if we're having issues during supervised visits, I don't know how long it would take to get out of supervised visits.
>
> On [Y.F.]'s case we're out of time. I would defer to the court on [U.S.]'s case, but that is my main concern is I haven't seen a lot of progress over the last two years.

(Tr. 320-321.)

**{¶ 26}** In a journal entry dated June 4, 2024, the juvenile court granted the agency's motion for permanent custody of U.S. and terminated Mother's parental rights. In a separate journal entry, the juvenile court denied the agency's motion for permanent custody of Y.F. and committed the child to the legal custody of Paternal Grandparents.

{¶ 27} Mother now appeals.

## II. Law and Analysis

### A. Legal Custody of Y.F.

{¶ 28} In the first assignment of error, Mother argues the juvenile court's judgment granting legal custody of Y.F. to Paternal Grandparents was not in the child's best interest. Alternatively, Mother's second assignment of error argues that the juvenile court committed reversible error by granting legal custody to Paternal Grandparents because they did not sign a statement of understanding in accordance with R.C. 2151.353(A)(3). We address these assigned errors together for the ease of discussion.

{¶ 29} Legal custody is defined by R.C. 2151.011(B)(21) as follows:

[A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

{¶ 30} Pursuant to R.C. 2151.353(A)(3), after a child has been adjudicated abused, neglected, or dependent, the court may "[a]ward legal custody of the child to . . . any . . . person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings."

{¶ 31} Legal custody is significantly different from the termination of parental rights — despite losing legal custody of a child, the parents of the child

retain residual parental rights, privileges, and responsibilities. R.C. 2151.353(A)(3)(c). For this reason, "'when a juvenile court awards legal custody following an adjudication of abuse, neglect, or dependency, "it does so by examining what would be in the best interest of the child based on the preponderance of the evidence."'" *In re A.C.*, 2019-Ohio-5127, ¶ 15 (8th Dist.), quoting *In re T.R.*, 2015-Ohio-4177, ¶ 44 (8th Dist.), quoting *In re M.J.M.,* 2010-Ohio-1674, ¶ 11, 14 (8th Dist.). "'Preponderance of the evidence' means 'evidence that's more probable, more persuasive, or of greater probative value.'" *In re C.V.M.*, 2012-Ohio-5514, ¶ 7 (8th Dist.), quoting *In re D.P.*, 2005-Ohio-5097, ¶ 52 (10th Dist.).

{¶ 32} Initially, Mother claims the juvenile court's judgment granting Father's motion for legal custody of Y.F. in favor of Paternal Grandparents is not supported by a preponderance of the evidence. Mother further argues that the juvenile court erred when it awarded legal custody to Paternal Grandparents because they failed to sign a statement of understanding in conformance with R.C. 2151.353(A)(3), which requires that "[a] person identified in a complaint or motion filed by a party to the proceedings as a proposed legal custodian shall be awarded legal custody of the child only if the person identified signs a statement of understanding for legal custody" that contains the provisions listed in R.C. 2151.353(A)(3)(a)-(d).

{¶ 33} In the agency's companion appeal,[1] this court held that the weight of the evidence presented at the permanent custody hearing "weighed in favor of permanent custody to CCDCFS." Accordingly, we found the juvenile court erred in granting legal custody to Paternal Grandparents.

{¶ 34} Ohio courts, including this court, have repeatedly emphasized "that if permanent custody is in the best interest of the child, legal custody to a relative necessarily is not." *In re B.K.*, 2023-Ohio-1820, ¶ 31 (8th Dist.), quoting *In re M.S.*, 2015-Ohio-1028, ¶ 11 (8th Dist.); *see also In re M.S.*, 2023-Ohio-1558, ¶ 26 (9th Dist.); *In re E.A.G.*, 2024-Ohio-315, ¶ 67 (4th Dist.) Because we have determined that placing the child in the agency's permanent custody is in her best interest, placing her in the Paternal Grandparents' legal custody necessarily is not. Accordingly, we find the juvenile court erred by granting legal custody of Y.F. to Paternal Grandparents. We, however, disagree with Mother's contention that she "is now able to provide a safe, appropriate home for Y.F." As noted by this court, Mother has not successfully completed her case-plan goals and continues to exhibit problematic behaviors in front of the children.

{¶ 35} Based on the foregoing, we sustain the first assignment of error and remand this matter for the juvenile court to facilitate the order set forth in Case No. 114040. The second assignment of error is moot.

---

[1] This appeal is a companion case to *In re Y.F.*, 8th Dist. Cuyahoga No. 114040.

## B. Termination of Parental Rights

{¶ 36} In the third and fourth assignments of error, Mother argues the juvenile court's decision to terminate her parental rights and grant permanent custody of U.S. to CCDCFS is against the manifest weight of the evidence.

{¶ 37} When reviewing for manifest weight,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20]. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.*, 2023-Ohio-4703, ¶ 14.

{¶ 38} Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

## 1. Permanent Custody Standard

{¶ 39} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham,* 59 Ohio St.2d 100, 106 (1979).

{¶ 40} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children."

*In re N.B.* at ¶ 67, citing *In re Howard,* 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

## 2. R.C. 2151.353(A)(4)

{¶ 41} An agency may obtain permanent custody of a child in two ways. *In re Ky.D.*, 2024-Ohio-3198, ¶ 27 (8th Dist.), citing *In re E.P.*, 2010-Ohio-2761, ¶ 22 (12th Dist.). An agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint under R.C. 2151.353(A)(4).

{¶ 42} In this case, CCDCFS requested permanent custody of U.S. as part of its abuse, neglect, and dependency complaint as set forth in R.C. 2151.353(A)(4). This court has previously explained:

> When proceeding on a complaint with an original dispositional request for permanent custody, the trial court must satisfy two statutory requirements before ordering a child to be placed in the permanent custody of a children's services agency. Specifically, the trial court must find, "in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent," and further must determine "in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child." R.C. 2151.353(A)(4).

*In re A.R.*, 2020-Ohio-5005, ¶ 31 (8th Dist.).

## First Prong: R.C. 2151.414(E)

{¶ 43} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's

parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.); *In re B.P.*, 2019-Ohio-2919, ¶ 13 (8th Dist.). A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 44} In this case, the juvenile court found the factors set forth under R.C. 2151.414(E)(1) and (4) supported the finding that U.S. cannot or should not be placed with a parent within a reasonable time. The provisions state, in pertinent part:

> (E) In determining . . . whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence . . . that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> . . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

{¶ 45} On appeal, Mother argues the juvenile court's findings under R.C. 2151.414(E) are not supported by the evidence adduced at the dispositional hearing. Mother contends "that the record reflects she has remedied the conditions causing removal of U.S." Specifically, Mother submits that she is (1) participating in and benefitting from mental-health counseling, (2) is medication compliant, (3) has stable housing, and (4) is able to provide for U.S.'s basic needs.

{¶ 46} In this case, the agency conceded that Mother has been engaged in multiple case-plan services, including basic-needs services, mental-health services, parenting services, and domestic-abuse services. Despite Mother's participation in these services, however, there continued to be ongoing issues with Mother's mental health and parenting skills. *See In re P.B.,* 2020-Ohio-4471, ¶ 92 (8th Dist.) ("[S]ubstantiated compliance with a case plan" is not, in and of itself, "dispositive" and "does not preclude a grant of permanent custody to a social services agency."); *In re J.B.,* 2013-Ohio-1704, ¶ 90 (8th Dist.), quoting *In re McKenzie,* 1995 Ohio App. LEXIS 4618, 11 (9th Dist. Oct. 18, 1995) ("'The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'").

{¶ 47} Regarding parenting, Norris testified that Mother was unemployed and struggles to care for both children at the same time. Additionally, Mother often

has trouble meeting the challenges associated with caring for U.S., who was under the age of one. Relatedly, Norris testified that Mother has been "sporadic" in attending her mental-health counseling services and has been historically inconsistent in taking her prescribed medications. As a result, Mother has continued to engage in verbal altercations and has not demonstrated the ability to control her actions with coping skills and prescribed medications. Mother continues to have violent outbursts during visits with children and, therefore, failed to address the agency's concerns with her behavioral issues. Significantly, Norris testified that Mother's explosive conduct has negatively affected the children. Y.F., for instance, often exhibited defiant or aggressive behaviors after visits with Mother. Finally, Mother has not complied with the substance-abuse aspect of her case plan to address her use disorder and has not demonstrated the ability to maintain sobriety. Under these circumstances, Norris and the child's GAL both expressed concern that Mother had not benefitted from her case-plan services because she "was still displaying the same behaviors" that caused the child to be removed from her care. (Tr. 110, 131, and 320-321.)

{¶ 48} Based on the foregoing, we find the weight of the evidence supports the juvenile court's conclusion that Mother failed to substantially remedy the conditions that caused the children to be placed outside the home. Standing alone, this evidence is sufficient to satisfy the first prong of the two-part analysis. *See In re M.S.K.*, 2023-Ohio-316, ¶ 31 (8th Dist.) Accordingly, the juvenile court

appropriately found that U.S. could not or should not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(E).

## Second Prong: Best interest of the Child

{¶ 49} Having determined that the manifest weight of the evidence supports the juvenile court's finding that U.S. could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis that requires the court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 50} To determine the best interest of a child, the trial court considers all relevant factors including, but not limited to, those listed in R.C. 2151.414(D)(1)(a)-(e):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 51} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Rather, the statute requires the court to weigh all relevant factors and find the best option for the child. *Id*. at ¶ 64. The focus of a best interest determination is the child, not the parent. *In re R.G.*, 2016-Ohio-7897, ¶ 28 (8th Dist.), citing *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.); *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist. 1994).

{¶ 52} In the journal entry, dated June 4, 2024, the trial court stated it found permanent custody to be in the child's best interest after its consideration of (a) the interaction and relationship with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers; (b) the wishes of the child, as expressed through the GAL; (c) the child's custodial history; and (d) the child's need for a legally secure permanent placement.

{¶ 53} On appeal, Mother argues the court erred in finding permanent custody to be in U.S.'s best interest because "she is in a position to care for [U.S.]." Mother reiterates her contention that she can provide for the child's basic needs and is "ready, willing, and able to provide a secure and safe home for U.S."

{¶ 54} After careful consideration of the testimony presented at the dispositional hearing, we find there is competent, credible evidence in the record to

support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D) and its conclusion that permanent custody to the agency is in the child's best interest.

{¶ 55} First, with respect to the child's relationship with her parents, siblings, relatives, and foster parents, the record reflects that U.S. has been in foster care since the time of her birth and has formed a significant bond with her foster family. Her basic needs are being met and the agency had no concerns with the foster family's ability to care for the child in the future. U.S. has a similar bond with her older sister, Y.F., who was also placed with the foster family. The evidence in the record concerning Mother's relationship and interactions with the child is minimal. Although Norris referenced Mother's tendency to "struggle" when U.S. becomes "fussy," she conceded that Mother gives U.S. "a lot of attention" during supervised visits. (Tr. 116.) Nevertheless, Norris and the GAL reiterated their concerns with Mother's volatile behavior in the presence of both children.

{¶ 56} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the children are too young to express their wishes. *In re M.D.*, 2022-Ohio-2672, ¶ 35 (8th Dist.). Here, U.S. was approximately seven-months old when the dispositional hearing concluded. Although the child could not formulate a meaningful expression of her wishes at the custody hearing due to his age, the GAL spoke on the child's behalf and recommended permanent custody to CCDCFS. (Tr. 320.) The GAL did indicate that she would defer to the court's judgment in U.S.'s case. However, the GAL further

emphasized that she had not "seen a lot of progress over the last two years." (Tr. 321.)

{¶ 57} Finally, regarding the R.C. 2151.414(D)(1)(c) and (d) factors, the record demonstrates that U.S. has been in the agency's custody since her birth. Since that time, Mother has been unable to resolve the issues that led to the removal of the child, including the issues related to parenting, mental-health, and substance abuse. The child's biological father is unknown and no suitable relatives were identified for placement. Thus, there is competent, credible evidence in the record supporting the juvenile court's finding that granting permanent custody to the agency is the only effective means of providing U.S. with a legally secure permanent placement. *See In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.) (After finding that a child cannot or should not be placed with a parent, the trial court is required by statute to place the child with someone other than the parent.); *see also In re M.S.K.*, 2023-Ohio-316, ¶ 57 (8th Dist.) ("There is no statutory requirement that a child must first be placed into temporary custody prior to an order of permanent custody.").

{¶ 58} Balancing the foregoing factors and the recommendations of the GAL and agency employees, we find the juvenile court was free to conclude that the ultimate welfare of the child would be better served by an award of permanent custody. CCDCFS provided credible evidence regarding the child's custodial history, his need for legally secure placement, Mother's history with the agency, and Mother's failure to substantially remedy the conditions that caused U.S. to be removed from her care. Weighing the evidence collectively, we cannot say that the

juvenile court lost its way or created a manifest miscarriage of justice in determining by clear and convincing evidence, that permanent custody was in the best interest of U.S. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence.

{¶ 59} The third and fourth assignments of error are overruled.

{¶ 60} The juvenile court's judgment granting permanent custody of U.S. to CCDCFS is affirmed. The judgment granting legal custody of Y.F. in favor of Paternal Grandparents is reversed. The matter remanded to the juvenile court for further proceedings consistent with this opinion.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHAEL JOHN RYAN, J., CONCUR