[Cite as *In re Z.L.*, 2025-Ohio-4851.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE Z.L., ET AL. | : |  |
|  | : | No. 114976 |
| Minor Children | : |  |
|  | : |  |
| [Appeal by H.L., Father] | : |  |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 23, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22906833, AD22906834, and AD22906835

### *Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and
Britta Barthol, Assistant Public Defender, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

DEENA R. CALABRESE, J.:

{¶ 1} Appellant H.L. ("Father") appeals from the judgment entries of the
Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court"), that
awarded custody of his children, Z.L. (d.o.b. 5/3/2012), H.L. (d.o.b. 2/18/2014), and
A.L. (d.o.b. 6/26/2015) (collectively "the children"), to appellee Cuyahoga County
Department of Children and Family Services ("the agency" or "CCDCFS") and

terminated all parental rights and the denial of Father's motion for legal custody or, in the alternative, motion for legal custody with protective supervision to CCDCFS.[1] For the reasons stated below, we affirm the trial court's decision.

## I. Facts and Procedural History

### A. Prior CCDCFS Involvement

{¶ 2} This appeal involves Father and C.G. ("Mother") and their three children, Z.L., H.L., and A.L.[2]  The family has had recurring involvement with CCDCFS throughout the children's lives.  Mother's first involvement with the New Jersey Department of Children and Family Services was in 2012 when Z.L. was an infant.  In that case, there were concerns of domestic violence between Father and Mother in Z.L.'s presence.  Mother and Z.L. moved to Ohio after Z.L. was returned to Mother's custody.[3]

{¶ 3} In 2016, Mother and the children were involved with CCDCFS.  This time, all three children were removed from Mother's custody because of concerns regarding Mother's mental health and domestic violence between Mother and Father.  On May 14, 2016, each of the children were adjudicated to be dependent.  (CCDCFS exhibits Nos. 17, 20, 23.)  The complaint alleged that Mother threatened

---

[1] Cases were filed separately for each of the children.  Because the journal entries are virtually identical, we address them collectively.  Citations to the record are from documents in Cuyahoga J.C. No. AD22906833.

[2] Father's appeal is a companion case to Mother's consolidated appeal, *In re Z.L.*, Nos. 114984, 114986, and 114987 (8th Dist. Oct. 23, 2025).

[3] Although it is not clear from the record, it appears that H.L. was born around the time that Z.L. was reunited with Mother and they moved to Ohio.

to kill the children. Father completed services for domestic violence, substance-abuse treatment, anger management, and parenting as part of his case plan. (Feb. 27, 2025, tr. 23.) On January 18, 2018, after spending one and one-half years in agency custody, the children were reunified with Father.

**B. The Present Case**

{¶ 4} In this case, Father and the children became involved with CCDCFS again in 2022. On June 29, 2022, after an emergency-custody hearing, the children were placed in the predispositional temporary custody of CCDCFS and have been in the custody of CCDCFS since that time. (July 25, 2022, tr. 2.) On July 1, 2022, CCDCFS filed a complaint alleging the children to be abused and dependent and requesting the children be placed in Mother's legal custody with protective supervision to CCDCFS. The complaint alleged that Father was arrested after Mother and Father engaged in domestic violence in the presence of the children.

{¶ 5} On July 26, 2022, a case plan was filed in this case, with a goal of reunification. The case plan states the children "have been exposed to long term domestic violence in the home." It also states that Father has anger-management issues that led to the domestic-violence incidents. The case plan further states the following:

> There are concerns regarding the father and his interactions with his children. Children are reporting that he is excessively yelling at them and does use physical discipline/non verbal intimidation. Children are reporting that he scares them.

The case-plan services for Father included domestic-violence classes, mental-health services, anger-management classes, parenting classes, and maintaining separate

housing from Mother. The case plan was amended several times during the pendency of the case. Of relevance here, on February 9, 2024, the case plan was amended to add substance-abuse services for Father.

{¶ 6} On September 21, 2022, the juvenile court found that Father stipulated to the complaint as written and the children were adjudicated to be abused and dependent. The juvenile court also found that "[p]ursuant to []R.C. 2151.28(L), Mother and Father have a domestically violent relationship which prohibits them from providing a safe home for the child[ren] at this time." On October 31, 2022, the children were committed to the temporary custody of CCDCFS. On August 24, 2023, the juvenile court granted CCDCFS's motion for a first extension of temporary custody. On February 15, 2024, the juvenile court granted CCDCFS's second extension of the order for temporary custody to July 1, 2024.

{¶ 7} On September 12, 2024, CCDCFS filed a motion to modify temporary custody to permanent custody to CCDCFS. On February 10, 2025, Father filed a motion to terminate CCDCFS's custody and grant legal custody to Father or, in the alternative, grant legal custody to Father with protective supervision.

## C. The Permanent-Custody Hearing

{¶ 8} On February 27, 2025, the juvenile court conducted a trial on CCDCFS's motion to modify temporary custody to permanent custody and Father's motion for legal custody or, in the alternative, motion for legal custody with protective supervision. The relevant testimony and evidence presented at the trial were as follows.

### D. CCDCFS's Witness Testimony

#### 1. Natasha Johnson

{¶ 9} Natasha Johnson ("Johnson") testified that she is an extended services worker for CCDCFS. She became involved with the children when she was assigned to work with the family in July 2022.

{¶ 10} Johnson testified that a case plan was developed that included domestic violence, mental health, anger management, parenting, family therapy, substance abuse, and maintenance of independent-housing objectives for Father. Johnson testified that although Father completed the objectives in his case plan, she did not believe he benefited from the services.

{¶ 11} Father had a pending domestic-violence charge when Johnson was assigned to the case. The court in the criminal case had prohibited Father from contacting Mother and the children. That order was in effect from approximately June 2022 until September 2023. Father was ultimately convicted of domestic violence. He completed the Domestic Intervention, Education & Training Program ordered in the criminal case.

{¶ 12} Johnson testified that she did not believe Father benefited from domestic-violence classes. Father has completed at least three domestic-violence programs across the three CCDCFS cases. During this case, Father was referred to Step Forward for domestic-violence services. Step Forward originally declined to accept Father into the class because he was reporting that he was the victim of the domestic violence, even though he had a pending criminal domestic-violence charge

and an ankle monitor related to the case. Father was later accepted into Step Forward and completed the program.

{¶ 13} Johnson pointed out that despite their history of domestic violence, Father completing three domestic-violence classes, and no-contact orders that Father and Mother had against each other at varying times, Father continued to spend time with Mother and engage in domestic-violence incidents. In January 2024, Father drove Mother to the Jane Edna Hunter building to pick up one of the children's phones. When Johnson confronted Father about spending time with Mother, he denied driving Mother. Then, in February 2024, Father and Mother engaged in another domestic-violence incident. Father initially told Johnson that incident occurred after he invited Mother over purportedly to discuss one of the children. This meeting led to Mother allegedly breaking a window and TV stand and attempting to stab Father. As a result of the incident, Father was granted a protection order against Mother that expired around the time of the permanent-custody hearing.

{¶ 14} Johnson also testified that she did not believe Father benefitted from substance-abuse services. Father went to CHOICES Behavioral Health as a self-referral in February 2024. However, he refused to complete a release of information until approximately December 2024. Although Father had been reporting to her that he had been clean since 2017, the CHOICES assessment revealed that Father admitted to recent use of cocaine, and also mentioned use of ecstasy, marijuana, and alcohol. Father was asked to submit to hair and nail drug screens at the end of

January 2024. He cited to various reasons he could not submit to the nail screen, such as his girlfriend cut his nails, he cut his nails because of his anxiety, he bit his nails, and his nails did not grow. When asked to submit to a hair screen, he repeatedly shaved his head and stated his hair did not grow. Father finally submitted to the hair-drug screen around the middle of March 2024 and again on October 30, 2024. For the March hair-drug screen, because Father repeatedly cut his hair, there was a concern that his hair was not long enough to provide a sufficient quantity for the test. Both of the hair drug screen results were negative. During this time, Father submitted to several urine screens that resulted in negative results.

{¶ 15} Father did not complete his substance-abuse objective of the case plan. CCDCFS considered October 30, 2024, to be Father's sobriety date because his missed drug screens before that date are considered to be presumed positives. Father began to comply with drug testing beginning on October 30, 2024, when he tested negative. At the time of the hearing, Father had been testing negative for four months; however, CCDCFS generally considers six months of sobriety to be sufficient for completion of the substance-abuse-case-plan objective.

{¶ 16} Johnson also stated she did not believe that Father has benefited from mental-health services. Father was referred for a mental-health assessment at the Centers for Families and Children ("The Centers") because of aggression. He was diagnosed with generalized anxiety. He participated in counseling at The Centers until summer 2024 then he told Johnson he "was done with it." In December 2024, Father started attending counseling at The Centers again. Father was still reporting

that he had a significant amount of anxiety and stated his anxiety was one of the reasons he could not submit to nail screens required for the substance-use screens.

{¶ 17} Johnson testified that she did not believe Father benefitted from parenting classes. Parenting services were on the case plan for Father because of his aggressive parenting style. Father admitted to Johnson that he was verbally aggressive with the children, and she learned that he physically disciplined the children. The children disclosed they feared Father. Father completed three different types of parenting services with Passages, The Centers, and Beech Brook in this case. This was in addition to the parenting class he completed when the family was previously involved with CCDCFS. Johnson did not believe that Father benefited from the parenting classes. During summer 2024, Johnson was supervising a visit at Father's home when Z.L. began to bully a schoolmate and Johnson urged Father to intervene. Father did not correct Z.L.'s inappropriate behavior. Instead, he encouraged Z.L. by telling her things like "get 'em [Z.]" Father had completed two parenting classes at that time.

{¶ 18} Johnson also testified that she had concerns about Father's visits with the children. She described the initial visits with Father as "complete chaos," with the children "leaving the home, storming out of the home, screaming at the therapist, screaming at one another, screaming at [her], occasionally[.]" More recently, the visits with Father involved almost no interaction between Father and the children. The children closed themselves up in their rooms for the duration of the visits. Johnson stated that the only time Father engaged in an activity with the

children during a visit was when Father was told the children's attorney and the guardian ad litem ("GAL") would be attending. During that visit, Father played Uno with the children.

{¶ 19} Johnson also stated that Father would watch fighting videos with the children and they once watched a movie with domestic violence, sexual content, and profanity. When Johnson expressed that the content was inappropriate given that A.L. was acting in an aggressive manner at school and with caregivers, Father was dismissive and stated, "[A.L.]'s been doing that since the dawn of time." A.L. attended an alternative school for children with behavioral difficulties and required medication because of those difficulties. Father denied that the alternative school and medication were necessary for A.L. Johnson had concerns that Father would not continue the medication if A.L. was returned to his custody. Johnson also stated that Z.L. and A.L. were easier to interact with outside of Father's presence.

{¶ 20} Johnson also testified that Father exhibited aggression towards her at a visit, necessitating her to always having a colleague accompany her to supervise the visits between Father and the children.

{¶ 21} Johnson had concerns about Father's manipulative behavior and discussed the various ways Father tried to manipulate her, the children, providers, foster parents, and Mother. For example, he told Mother that Father and Johnson had discussed Mother (they did not). He told the children his visits with them were cut shorter because of Johnson, when he had requested that the visits be shortened.

Father also told the children their visits with him were canceled because of Johnson when they were canceled at his request.

{¶ 22} Johnson testified that she did not believe the family benefited from family therapy. The family was referred to therapy with CHOICES Behavioral Healthcare ("Choices") in October or November 2023 after the children refused to communicate or visit with Father. Because of the turnover at Choices, the family had four different therapists over the course of this case. Father refused to use any other provider for family therapy. Johnson testified that the referral was made because of the children's estrangement from Father, their fear of Father, his aggression towards the children, and the domestic violence between Father and Mother. Based on notes she received from the therapist, she did not believe there was any benefit from family therapy or that the issues were being addressed in the sessions.

{¶ 23} Johnson testified that she had concerns about Father's ability to maintain employment. She was able to verify Father's employment at Icon Preparatory School ("Icon") over summer 2024. After that, Father provided her with paycheck stubs for a teaching position he had purportedly recently started at Icon. She questioned whether Father was employed there because in December 2024, Father presented her with paystubs dated November 2015, November 2025, and December 2025, the name of the employer was misspelled on the paystubs, they showed he was not paying any taxes, and the net pay was for less than the amount

of his newly rented apartment. (CCDCFS exhibit Nos. 16 A-C). Johnson stated that at least four times she has suspected Father was providing her with fake paystubs.

{¶ 24} Johnson also testified that she was concerned about Father's ability to maintain stable housing. At the time of the hearing, Father had just moved from Cleveland to an apartment in Euclid. The rent at the new apartment was twice as much as Father was paying for rent in Cleveland. Father showed Johnson the apartment in February 2024, even though the lease he showed her began on March 1, 2024. In addition, the rent amount was for more than Father's net pay. Johnson did not believe that Father could meet the children's basic needs on an ongoing basis.

{¶ 25} Johnson stated that there was no time left in the temporary-custody period for Father to complete, and benefit from, additional services related to his case plan objectives. (Feb. 27, 2025, tr. 24-176.)

### E. Father's Witnesses

#### 1. Mary Atkins

{¶ 26} Mary Atkins ("Atkins") testified that she was the foster placement for two of the children, Z.L. and A.L., from October 24, 2024, through the date of the trial on February 27, 2025. She stated that both Z.L. and A.L. spoke with Father frequently via telephone. When they were first placed with Atkins, A.L. would sometimes be disruptive. Beginning in January 2025, Z.L. would call Father to calm A.L. down when she was disruptive. Z.L. and A.L. expressed to Atkins that they wished to be reunited with Father. Atkins never witnessed Father interact with Z.L.

and A.L. in person and did not have any knowledge of the issues that led to the removal of the children from the home or of Father's case plan. (Feb. 27, 2025, tr. 185-204.)

**2. Anthony Lash**

{¶ 27} Anthony Lash ("Lash") testified that he is employed by Choices as the clinical director and as a mental-health and substance-use therapist. Lash testified that Father came in as a self-referral for a substance-use assessment on February 8, 2024. As part of the assessment, Father submitted to urinalysis on February 8 and 15, 2024, and the results were negative. There were no recommendations for substance-abuse treatment. Lash also testified that he never personally interacted with Father or observed him with the children. (Feb. 27, 2025, tr. 224-238.)

**3. Robert Cade**

{¶ 28} Robert Cade ("Cade") testified that he is employed as a clinical counselor at Choices. He began meeting weekly with Father and the children in August 2024 for family-counseling sessions. The family had previously been engaged in family-counseling sessions for approximately one year with another therapist. When Cade took over counseling the family, they were still struggling with communication. Cade noted improvement in the family's communication between August 2024 and the date of the hearing. Although the referral was for counseling services associated with the history of domestic violence, they had not discussed domestic violence during the sessions. They also did not discuss the children's previous estrangement from Father. (Feb. 27, 2025, tr. 240-265.)

### 4. Marcus Jordan

{¶ 29} Marcus Jordan ("Jordan") testified that he is employed at the Fatherhood Initiative and RISE Reentry Program ("Reentry Program") as the program manager. Father completed a parenting course and an AA course through the Reentry Program. Jordan stated that Father benefited from the courses but admitted he has never seen Father interact with the children and was not aware that Father had a protection order against Mother stemming from a domestic-violence incident that took place during the pendency of this case. In October 2024, Father became a coach with the Reentry Program. (Feb. 27, 2025, tr. 267-295.)

### 5. Herbert Williams

{¶ 30} Herbert Williams ("Williams") testified that he was previously employed by Step Forward as a social worker running a domestic-violence group. He testified that Father completed, and benefitted from, a 24-week domestic-violence program. He stated that completion of the course did not necessarily mean an individual would change their behavior. Williams also stated that if an individual completed the program and then subsequently engaged in domestic violence, Williams would still say that individual benefitted from the program. (Feb. 27, 2025, tr. 302-318.)

### 6. Father

{¶ 31} Father testified about his progress on the case plan. He stated he completed anger-management and domestic-violence classes, parenting classes, mental-health counseling, and family counseling. Father's testimony largely

contradicted Johnson's testimony. For example, he stated he benefited from the services he completed. Father also denied any gaps in his mental-health counseling, denied aggressive behavior with Johnson, and explained his paystubs from Icon contained errors made by interns employed by human resources. (Feb. 27, 2025, tr. 320-396.)

## F. GAL Report

{¶ 32} On February 20, 2025, the children's GAL filed a report and recommendation. The GAL's report indicated she had been appointed in the matter on July 11, 2022. The GAL indicated that Father did not have any visits with the children beginning on June 29, 2022, when Father was arrested after a domestic-violence incident between him and Mother. After Father filed a motion for visitation on February 16, 2023, the children indicated to the GAL that "they were not ready to start seeing their father." The children began visits with Father in November 2023. In December 2023, the "children stated that they want to be with either parent but simply out of CCDCFS Custody." They later expressed a desire to be reunited with Father. The GAL noted that Father was noncompliant with case-plan services, specifically with court-ordered drug screens. She also pointed out that based on their history, there was a high likelihood that Father and Mother would begin cohabiting again if the children were reunified with either parent. The GAL recommended that the juvenile court grant CCDCFS's motion for permanent custody.

{¶ 33} The juvenile court also conducted an in camera interview with the children prior to the hearing.

**G. The Decision**

{¶ 34} On February 28, 2025, the juvenile court issued journal entries in each case granting CCDCFS's motion to modify temporary custody to permanent custody and denying Father's motion for legal custody. The juvenile court also made the following findings, in relevant part:

> The Guardian ad Litem recommends that Permanent Custody is in the Child's best interest.
>
> The Court finds by clear and convincing evidence that pursuant to O.R.C. 2151.414(B)(1):
>
> (d) The child has been in the temporary custody of the public children services agency or private child placing agency for twelve or more months of a consecutive twenty-two month period.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected or dependent child on three separate occasions by any court in this state or another state.
>
> With respect to the best interest of the child, the Court has considered the following factors under O.R.C. 2151.414(D)(1):
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child. *Based on the in-camera interview and the testimony at trial, the Court is unsure as to the bond the children have with their father. The Court finds that there is not much interaction that takes place as visits between the children with their father and with each other. Mother has not visited with the child in approximately one year.*
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *The GAL recommends permanent custody. The Court*

*conducted an in-camera interview with the child and is aware of the child's wishes.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *The child has been in Agency custody since June 2022 and this is the third time the child has been in Agency custody.*

(d) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody. *The child deserves a safe and stable home environment where her needs can be met and she can thrive. This cannot be achieved with either parent as they have not remedied the cause for removal. The Agency has not identified a willing or appropriate family member to care for the child.*

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child. *(E)(10) applies.*

With respect to the best interest of the child, the Court finds that pursuant to O.R.C. 2151.414(D)(2) that all of the following apply:

(a) The Court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in the agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Ohio Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of Section 2151.353 of the Ohio Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal Custody.

As all of these sections apply, permanent custody is in the best interest of the child, and this Court as required by this statute, shall commit the child to the permanent custody of CCDCFS.

Additionally, the Court finds by clear and convincing evidence that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, pursuant to O.R.C. 2151.414(E):

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

(10) The parent has abandoned the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

(15) The parent has committed abuse as described in section 2151.031 of the Ohio Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Ohio Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factors the Court finds relevant: *Father has convictions for domestic violence. Mother was not present for trial and has not appeared in court at a minimum since the permanent custody motion was filed.*

The Court had the ability to speak to the child in person at the in-camera interview and had the opportunity to assess and determine the credibility of all the witnesses that testified at trial. The Court finds the testimony of the CCDCFS case worker to be consistent and credible. Father's testimony/evidence and the testimony of all of his witnesses had inconsistencies, contradictions, and even inaccurate information. Additionally, none of Father's witnesses have ever seen Father with the child.

Therefore, the Court finds by clear and convincing evidence, pursuant to both 2151.414(D)(1) and (D)(2), that it is in the best interest of the child to be placed in the Permanent Custody of CCDCFS. The Motion to Modify Temporary Custody to Permanent Custody is granted.

The child's continued residence in or return to the home of [Mother] and/or [Father] would be contrary to the child's best interest.

The Court further finds that reasonable efforts were made to prevent the removal of the child from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include: For the Mother, Mental Health, Substance Abuse, Domestic Violence and Housing Services. For the Father, Domestic Violence, Anger Management, Parenting, Substance Abuse, and Family Counseling Services. For the Child, Counseling Services.

The Motion to Terminate CCDCFS'S Temporary Legal Custody of Minor Children and Grant Legal Custody to Father or in the Alternative Grant Legal Custody to Father with Protective Supervision is denied. The Motion for Overnight Visitation with Father is moot.

. . . The Child is committed to the Permanent Custody of the Cuyahoga County Division of Children and Family Services. The parental rights of [Mother] and [Father] are terminated.

(Emphasis in original.)

{¶ 35} Father's appeal stems from these orders. He raises two assignments

of error for our review:

1. The trial court's decision granting permanent custody of appellant's children to CCDCFS is against the weight of the evidence as it is not supported by clear and convincing evidence.

2. The trial court erred when it denied Father's Motion for Legal Custody as it is supported by a preponderance of the evidence and is in the best interest of the children.

## II. Law and Analysis

{¶ 36} In his first assignment of error, Father argues that the juvenile court's grant of permanent custody of the children to CCDCFS is against the manifest weight of the evidence.

{¶ 37} A juvenile court's decision to grant permanent custody is reviewed under a manifest-weight-of-the-evidence and/or sufficiency-of-the-evidence standard. *In re H.G.*, 2024-Ohio-3408, ¶ 13 (8th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 11. In this case, Father's argument demands a manifest-weight-of-the-evidence review.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179,] ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id*. at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

{¶ 38} "Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, 'by clear and convincing evidence, that it is in the best interest of the

child' to do so and that one of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies." *In re Z.C.* at ¶ 7. "Clear and convincing evidence is 'that measure or degree of proof which is more than a mere "preponderance of the evidence" but not to the extent of such certainty required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re A.M.*, 2024-Ohio-1168, ¶ 15 (8th Dist.), quoting *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist. 1994), citing *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176 (1987).

{¶ 39} Clear and convincing evidence has been defined as the following:

> [T]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*.

(Emphasis in original.) *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 40} The relevant subsections under R.C. 2151.414(B)(1) are as follows:

> (d) The child has been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three occasions by any court in this state or another state

{¶ 41} Here, in each case, the juvenile court found that the children had been in the custody of CCDCFS for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d). Father concedes that at the time of the hearing, the children had been in the custody of CCDCFS for 12 or more months of a consecutive 22-month period.

{¶ 42} In addition, Father does not contest the juvenile court's finding that any one of the children has been adjudicated abused, neglected, or dependent on three occasions by any court in the state or another state pursuant to R.C. 2151.414(B)(1)(e). Thus, there is no need to address the juvenile court's findings pursuant to R.C. 2151.414(B)(1).

## A. Best Interests

{¶ 43} The second step in the analysis is determining if permanent custody is in the best interest of the children. The juvenile court looks to the factors laid out in R.C. 2151.414(D). The juvenile court is required to make findings under one of two alternative provisions as set forth at subparagraphs (D)(1) and (D)(2) of the statute. The interplay has been explained as follows:

> "As we understand division (D)(2), if all of the facts enumerated therein apply, then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1). But if it is not the case that all of the facts enumerated in division (D)(2) exist; that is, if any one of the facts enumerated in division (D)(2) does not exist, then the trial court must proceed to the weighing of factors set forth in division (D)(1) to determine the child's best interest."

*In re T.B.*, 2025-Ohio-2075, ¶ 37 (8th Dist.), quoting *In re K.H.*, 2010-Ohio-1609, ¶ 54 (2d Dist.). *See also In re P.J.*, 2021-Ohio-1821, ¶ 26 (8th Dist.) (Where "all the

factors under R.C. 2151.414(D)(2) apply, permanent custody was necessarily in the best interest of the child and the juvenile court was required to grant permanent custody to CCDCFS.").

**B. Best Interests Pursuant to R.C. 2151.414(D)(2)**

{¶ 44} Pursuant to R.C. 2151.414(D)(2), if all of the following apply, then

permanent custody is in the best interest of the child, and the court *shall* commit the child to the permanent custody of a public children services agency or private child placing agency:

(a) The court determines by clear and convincing evidence that one or more of the factors in division (E) of this section exist and the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent.

(b) The child has been in the agency's custody for two years or longer, and no longer qualifies for temporary custody pursuant to division (D) of section 2151.415 of the Ohio Revised Code.

(c) The child does not meet the requirements for a planned permanent living arrangement pursuant to division (A)(5) of Section 2151.353 of the Ohio Revised Code.

(d) Prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody.

(Emphasis added.)

{¶ 45} Father does not dispute that the R.C. 2151.414(D)(2)(b) and (c) factors apply. Father argues that R.C. 2151.414(D)(2)(a) and (d) were not met and therefore the juvenile court erred when it found that permanent custody was in the best interests of the children under R.C. 2151.414(D)(2).

{¶ 46} Father first argues that there is not clear and convincing evidence that pursuant to R.C. 2151.414(D)(2)(a), the factors in R.C. 2151.414(E) are present. The

juvenile court found that pursuant to R.C. 2151.414(E), the children cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent within a reasonable time because factors existed as to R.C. 2151.414(E)(1), (4), (10), (14), (15), and (16).

{¶ 47} Father challenges each of the R.C. 2151.414(E) factors ((1), (4), (10), (14), (15), and (16)) that the juvenile court found to apply. A finding by the juvenile court that any one of the R.C. 2151.414(E) factors is met, results in a subsequent finding that a child cannot or should not be placed with a parent. *In re A.E.*, 2025-Ohio-1466, ¶ 14 (8th Dist.), citing *In re L.V.*, 2024-Ohio-5917, ¶ 53 (8th Dist.), citing *In re Ky.D.*, 2024-Ohio-3198, ¶ 36 (8th Dist.). Therefore, this court need not address each of the R.C. 2151.414(E) factors listed in the findings by the juvenile court. *Id.*

{¶ 48} Father challenges the juvenile court's finding that he failed to remedy the conditions that led to the removal of the children pursuant to R.C. 2151.414(E)(1). Johnson testified that although Father completed case-plan objectives, she did not see any change in his behavior that demonstrated sufficient benefit from those services.

{¶ 49} Father argues that he completed and benefited from domestic-violence programs as required by his case plan. The record shows that even after completing several domestic-violence classes Father continued to spend time with Mother and continued to be involved in domestic-violence incidents with Mother. In fact, it was a domestic-violence incident between Mother and Father in the

presence of the children that led to the removal of the children from the home in this case. Father was later convicted of domestic violence. This domestic violence occurred after Father completed domestic-violence objectives in the case plan in a previous CCDCFS case. Despite their history and taking domestic-violence classes, Father continued to spend time with Mother. Johnson testified that she saw them together at the Jane Edna Hunter Building and that Father stated he invited Mother over to his home to discuss one of the children, resulting in another domestic-violence incident. Williams testified on Father's behalf but acknowledged that completing the domestic violence program "does not guarantee [] that someone is not going to re-offend." (Tr. 317.) Therefore, the record supports a finding that Father did not remedy the domestic-violence concerns that led to the removal of the children from the home.

{¶ 50} The children's GAL's report expressed concern that if either parent was awarded legal custody of the children, Mother and Father would begin to live together again based on their past behavior.

{¶ 51} Father argues that he completed and benefited from parenting classes. The record shows that even after Father completed three different types of parenting classes, Johnson observed Father engage in inappropriate parenting with the children. He did not intervene and correct them when they exhibited inappropriate and aggressive behavior. Father also seemed to encourage the behavior by watching aggressive and inappropriate videos and movies with the children and encouraging Z.L. to bully a classmate. Jordan testified on Father's behalf but admitted that he

has never observed Father interact with the children. Therefore, the record supports a finding that Father did not remedy the parenting concerns that led to the removal of the children from the home

{¶ 52} Father argues that he benefited from family counseling with the children. The record shows that Johnson testified that Father primarily discussed the court case with CCDCFS, the juvenile court, and Johnson during family-therapy sessions. The domestic violence that led to the removal of the children from the home and the children's previous estrangement from Father were not discussed during family-therapy sessions. Father and the children engaged in family therapy, but the record supports a finding that family therapy did not remedy the conditions that led to the removal of the children from the home.

{¶ 53} Father argues he completed the substance-use objective of the case plan. The record shows that Father's repeated failure to comply with drug screen requests, specifically the hair and nail screens, resulted in a sobriety date of October 30, 2024. At the time of the hearing, Father had four months of sobriety and CCDCFS necessitated six months of sobriety for completion of that case-plan objective. Therefore, the record supports a finding that Father did not remedy his substance-use concerns.

{¶ 54} Father argues that his completion of case-plan services indicates that he has remedied the conditions that led to the removal of the children from the home. We have recently found that

even if mother had completed a case plan, such a plan is "a means to a goal, but not the goal itself." *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.). Accordingly, "courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency." *Id.*, citing *In re J.L.*, 2004-Ohio-6024, ¶ 20 (8th Dist.), and *In re Mraz*, 2002-Ohio-7278 (12th Dist.). *See also In re M.T.*, 2024-Ohio-3111, ¶ 51 (8th Dist.) ("[E]ven substantial compliance with case plan services" is not dispositive because the ultimate issue is "'"whether the parent has substantially remedied the conditions that caused the child's removal."'"), quoting *In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.), quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *11 (9th Dist. Oct. 18, 1995).

*In re T.B.*, 2025-Ohio-2075, at ¶ 56 (8th Dist.).

{¶ 55} The Ohio Supreme Court has noted that "[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Z.C.*, 2023-Ohio-4703, at ¶ 14, citing *Seasons Coal Co., Inc.*, 10 Ohio St.3d at 80, fn. 3

{¶ 56} In this case, Father presented witnesses that supported his contention that he benefited from case-plan-required services. However, each of those witnesses either never observed Father with the children, were not aware of the conditions that led to the removal of the children from the home, or were not fully aware of the issues in this case. The record supports that although Father may have completed his case plan, he did not benefit from the services. Therefore, the juvenile court's finding that the children cannot be placed with one of the children's parents within a reasonable time or should not be placed with either parent under R.C. 2151.414(E)(1) was supported by the record.

{¶ 57} Father also challenges the juvenile court's finding pursuant to R.C. 2151.414(E)(16) that allows the juvenile court to consider "any other factor the court considers relevant." *In re S.H.*, 2019-Ohio-3575, ¶ 29 (8th Dist.). The juvenile court in this case, when making a finding pursuant to R.C. 2151.414(E)(16), stated that "Father has convictions for domestic violence." Based on the testimony of Johnson and the GAL, Father and Mother continued to spend time together. In addition, the GAL's report noted a concern that based on their past behavior, Father and Mother would begin to live together again if one of them was granted legal custody of the children. That concern along with the history of domestic violence between Father and Mother supports the juvenile court's other factors finding pursuant to R.C. 2151.414(E)(16).

{¶ 58} Because we find that factors (1) and (16) under R.C. 2151.414(E) were met, we also find that the evidence in the record supports the juvenile court's finding that the children cannot or should not be returned to the parents. In addition, there is no need to address the other factors under R.C. 2151.414(E).

{¶ 59} Lastly, the juvenile court found that pursuant to R.C. 2151.414(D)(2)(d), prior to the dispositional hearing, no relative or other interested person has filed, or has been identified in, a motion for legal custody. Father argues that he filed a motion for legal custody of the children. However, R.C. 2151.414(D)(2)(d) contemplates legal custody to a "relative or other interested person," meaning a nonparent. *See In re M.G.*, 2014-Ohio-975, ¶ 31 (11th Dist.).

Although Father had a pending motion for legal custody, the record does not show any motion for custody by a relative or other interested person.

{¶ 60} We find that the juvenile court's determinations under R.C. 2151.414(D)(2) are supported by the record. Because all of the factors under R.C. 2151.414(D)(2) apply, permanent custody is in the best interests of the children and the juvenile court was required to grant permanent custody to CCDCFS. *In re P.J.*, 2021-Ohio-1821, at ¶ 26 (8th Dist.). In addition, because we find that the R.C. 2151.414(D)(2) best-interests factors are supported by the record, there is no need to address the R.C. 2151.414(D)(1) best-interests factors. *In re A.S.*, 2021-Ohio-3829, ¶ 42 (8th Dist.).

{¶ 61} We find that the juvenile court considered the relevant statutory factors in granting permanent custody and its findings were supported by competent, credible evidence in the record. We cannot say the grant of permanent custody was against the manifest weight of the evidence or that the judgment created a manifest injustice. Therefore, Father's first assignment of error is overruled.

## C. Legal Custody

{¶ 62} In his second assignment of error, Father argues that the juvenile court erred when it denied his motion for legal custody of the children with protective supervision.

{¶ 63} Under R.C. 2151.353(A)(3), the juvenile court may grant legal custody to any person who files a motion or who is identified as a proposed legal custodian in a complaint or motion requesting legal custody of the child prior to the

dispositional hearing. *In re Ry.T.*, 2023-Ohio-12, ¶ 29 (8th Dist.). "Legal custody" is defined as

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21).

{¶ 64} However, when ruling on a motion for permanent custody, "[R.C. 2151.414] does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor." *In re Schaefer*, 2006-Ohio-5513, ¶ 64. Rather, R.C. 2151.414 "requires a weighing of all the relevant factors" and to "find the best option for the child . . . ." *Id.* Furthermore, if "permanent custody is in the best interest of the child, legal custody necessarily is not." *In re D.E.*, 2025-Ohio-654, ¶ 15 (8th Dist.), citing *In re Y.F.,* 2024-Ohio-5605, ¶ 34 (8th Dist.).

{¶ 65} Given the concerns that were raised, the trial court did not err in finding that legal custody to Father with protective supervision was not in the children's best interest. Moreover, we find no error in the juvenile court's denial of Father's motion for legal custody with protective supervision of the children. Accordingly, Father's second assignment of error is overruled.

{¶ 66} We find no error in the juvenile court's judgment award of permanent custody of the children to CCDCFS or the denial of Father's motion for legal custody

with protective supervision.  Accordingly, we affirm the judgment of the juvenile court.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
DEENA R. CALABRESE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY J. BOYLE, J., CONCUR